**NORTHWEST ENVIRONMENTAL AD-VOCATES, a Non–Profit Oregon Corporation; and Nina Bell, Plaintiffs–Appellants,**

v.

**CITY OF PORTLAND, Defendant–Appellee.**

No. 92–35044.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1993.

Opinion Filed Dec. 10, 1993.

Opinion Withdrawn June 7, 1995.

Decided June 7, 1995.

Patrick A. Parenteau, Perkins Coie, Portland, OR, for plaintiffs-appellants, Northwest Environmental Advocates and Nina Bell.

Terence L. Thatcher, Deputy City Atty., Portland, OR, for defendant-appellee, City of Portland.

Catherine M. Flanagan, U.S. Dept. of Justice, Washington, DC, for amicus.

Before: PREGERSON, KLEINFELD, Circuit Judges, and INGRAM, District Judge.*

Opinion by Judge PREGERSON; Dissent by Judge KLEINFELD.

## ORDER

The opinion and dissent filed December 10, 1993 is withdrawn.

## OPINION

PREGERSON, Circuit Judge:

Northwest Environmental Advocates and Nina Bell ("NWEA") appeal the district court's judgment in favor of Portland on their claims that the City is violating the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* On April 16, 1991, NWEA filed suit in the district court alleging that Portland's practice of discharging raw sewage during times of precipitation from 54 outfall points was not covered by a permit and that the practice had caused and was continuing to cause violations of Oregon's water quality standards. After a trial on the written record, the district court held that (1) the contested discharge points were covered by Portland's pollution permit, and (2) the court lacked jurisdiction to consider NWEA's water quality violation claims.

In *Northwest Environmental Advocates v. City of Portland,* 11 F.3d 900 (9th Cir.1993) (*Northwest* ), we affirmed. We held that the contested discharge points were covered by Portland's pollution permit, *id.* at 903–06, and we held that Northwest Environmental Advocates lacked standing to bring a citizen

* The Honorable William Ingram, United States Senior District Judge for the Northern District of California, sitting by designation.

suit under § 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), to enforce water quality standards contained in Portland's permit. *Id.* at 906–11. On December 28, 1993, NWEA filed a petition for rehearing with suggestion for rehearing en banc. While this petition was still pending, the Supreme Court decided *PUD No. 1 of Jefferson County v. Washington Department of Ecology,* — U.S. —, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (*Jefferson County*).[1]

*Jefferson County* cast into considerable doubt our holding in *Northwest* that citizens do not have standing under the Clean Water Act to enforce water quality standards unless they have been translated into end-of-pipe effluent limitations. In light of *Jefferson County* and upon reconsideration of our prior opinion in *Northwest,* we now vacate that opinion, 11 F.3d at 900–913, and issue the following opinion.

## I. BACKGROUND

### A. The Portland Sewage Treatment System

At issue is the operation of the Portland sewer system. Portland operates a sewage treatment system that includes a network of combined sewage and stormwater pipes. Although the construction of these combined sewer pipes was discontinued in 1962, approximately 70% of the City's sewers remain combined sewers. Supp.E.R. 21. The effluent flowing in the system ideally is intercepted and transported to the Columbia Boulevard Treatment Plant where it is treated and then discharged into the Columbia River through two outfalls (Nos. 001 and 002). The interceptors can carry only " 'three times [the] average dry weather flow' " of effluent to the treatment plant. Sunnarborg Aff., Supp.E.R. 21. When the flow exceeds the plant's capacity, as can occur during periods of precipitation, the effluent is released untreated through a system of combined sewer overflow (CSO) outfalls in what is termed a CSO event. There are between 50 and 80 CSO events every year in Portland. E.R. 216; *see also* Bureau of Environmental Ser-

vices, City of Portland, *Columbia Slough Planning Study Background Report* (1989) (there are between 67 and 79 CSO events per year in the Columbia Slough).

Portland has 54 CSO outfalls; 12 drain into the Columbia Slough and 42 drain into the Willamette River. These waterways and their environs are used by Portland residents for recreation, including water contact activities such as boating. The release of untreated sewage into such public waters can present health risks. *See* National Combined Sewer Overflow Control Strategy, 54 Fed. Reg. 37370, 37371 (1989) ("CSOs have been shown to have severe adverse impacts on human health under certain conditions."). Appellants have supplied both anecdotal and scientific evidence of the polluted nature of the Willamette River and the Columbia Slough, especially during and immediately after CSO events. *See, e.g.,* Portland's Response to NWEA's Interrogatories, E.R. 119; Thutt Aff., E.R. 159–178; Pratt Aff., E.R. 20.

Abatement of CSO events is not easy. It has been estimated that to solve the problem in Portland alone will cost between $500 million and $1.2 billion dollars. E.R. 221. Estimates for the entire nation are between $70 billion and $109 billion dollars. *Environmental Groups Call for Effort to Deal with Combined Sewer Problems,* 23 Env.Rptr. (BNA) 13 (1992) (upgrades could start at between $70 and $80 billion dollars); *Combined Sewer Overflow Problems Demand New Approach, Local Officials Say,* 20 Env. Rptr. (BNA) 1939 (1990) (costs could be as high as $109 billion).

### B. Proceedings in the District Court

On February 1, 1991 NWEA gave written notice to Portland, the EPA Administrator, the State of Oregon, and the EPA Regional Administrator of its intent to file suit in the district court challenging the legality of the CSO discharges. Complaint, E.R. 9. In April 1991, after the required 60 day notice period, NWEA filed this action.

---

1. On April 25, 1994, the case failed to receive a majority of votes for consideration en banc. The panel then resumed control of the case. However, before the panel issued the final 5.4(b) Order, the Supreme Court decided *Jefferson County*.

The crux of the NWEA complaint was that the 54 CSO outfalls being used regularly by the City were not covered by the City's 1984 National Pollution Discharge Elimination System (NPDES) permit. Because unpermitted discharges of pollutants are illegal, NWEA argued the City was violating the CWA. Even if the CSOs were covered by the permit, NWEA argued that the discharges violated Oregon water quality standards and therefore violated a condition of the Permit. These violations were ongoing and likely to continue. NWEA prayed for injunctive relief and civil penalties. Complaint, E.R. 10–11.

The 1984 permit was to expire in July 1989. However it remained in effect until Portland and the Oregon Department of Environmental Quality (DEQ)[2] were able to complete the renewal process and agree on the terms of a new permit. DEQ forwarded a draft of a proposed renewal permit to Portland in December 1990. This draft permit required the City to "meet water quality standards at all discharge points, including CSOs, . . . ." Because Portland could not meet the five year time table set forth in the proposed renewal permit, id., the parties determined that a compliance order separate from the renewal permit, and requiring eventual abatement of all CSO events, was appropriate. After a period of Notice and Comment, Portland and the DEQ came to an agreement in August 1991. Under that settlement, Portland's new permit specifically listed the CSOs as permitted discharge points. In addition to the permit, the parties entered into a stipulation and final order (SFO) in which Portland agreed to replace the CSO system within the next 20 years.

Once these negotiations had been completed, Portland filed a motion to dismiss and the parties filed cross-motions for summary judgment. The court bifurcated the proceedings; first it would address whether Portland could be held liable for violations of the CWA, and then if necessary, determine whether violations had occurred and impose any necessary penalties. The parties stipulated to a trial of the liability phase on the summary judgment submissions, allowing the court to decide questions of fact as well as questions of law. Amended Opinion, E.R. 73.

After reviewing the submissions the district court issued an opinion and judgment. It later filed an amended opinion which was essentially the same as the original. The court found that Portland's 54 CSOs were covered by the 1984 NPDES permit, and thus that the City was not in violation of the Act for allowing unpermitted discharges. It also rejected NWEA's claim that Portland would nonetheless be liable for violating Oregon's water quality standards because the CWA did not confer federal jurisdiction to entertain citizen suits to enforce state water quality standards.

## II. ANALYSIS

### A. Does the 1984 Permit Cover the CSOs?

In the court below, NWEA argued that Portland had violated and continued to violate the CWA by discharging through unpermitted outfalls. The district court found otherwise, holding that the relevant NPDES discharge permit authorized CSO events under specific circumstances. NWEA asserts that the district court erred in so interpreting the permit.

▬ We review the district court's interpretation of the 1984 permit as we would the interpretation of a contract or other legal document. When reviewing a district court's interpretation of such a writing, the court reviews *de novo* the determination of whether it is ambiguous. *In re U.S. Fin. Sec. Litig.*, 729 F.2d 628, 632 (9th Cir.1984). Interpretation of an unambiguous writing is also a question of law subject to *de novo* review. *Culinary & Service Employees Union, Local 555 v. Hawaii Employee Ben. Admin. Inc.*, 688 F.2d 1228, 1230 (9th Cir. 1982). If the court must look to extrinsic evidence in order to interpret a writing, its findings of fact are reviewed for clear error. *U.S. Fin. Sec.*, 729 F.2d at 632; *Culinary & Service Employees Union*, 688 F.2d at 1230; *In re Agricultural Research & Technology Group, Inc.*, 916 F.2d 528, 537 (9th Cir.1990).

**2.** National Pollution Elimination Discharge Permits in Oregon are issued by DEQ.

NWEA argued in the court below that the 1984 permit covered only two point sources, outfalls 001 and 002 from the treatment plant.[3] The 1984 permit expressly "covers" only two point sources, outfalls 001 and 002 from the treatment plant. These outfalls are listed on the first page of the permit as the "SOURCES COVERED BY THIS PERMIT." E.R. 222. The 54 CSOs are not listed in this section. The first page of the permit also states that the receiving waterway for these discharges is the Columbia River. The Willamette River and the Columbia Slough are not mentioned.

Immediately below the section listing "SOURCES COVERED," the permit provides a description of the activities that are covered by the permit. This section, "PERMITTED ACTIVITIES," states that Portland is authorized to "operate a waste water collection, treatment, control and disposal system and discharge to public waters adequately treated waste waters only from the authorized discharge point *or points established in Schedule A . . . .*" E.R. 222 (emphasis added). Schedule A provides the effluent limitations for outfalls 001 and 002. More importantly, however, it provides that:

> The permittee shall provide interception of at least three times the dry weather flow before discharge shall occur at any diversion structure. The overflow from these diversion structures shall be minimized and/or eliminated as much as practicable during the water recreation season (June 1 to October 31).[4]

E.R. 223. Thus, on the face of the permit it appears that CSO events were considered to be a "permitted activity." Finally, Schedule C provides that the City must "continue to work toward the separation of sanitary sewage and storm water in presently developed areas in which this method is cost effective." E.R. 224.

NWEA contends that the court should only heed the first portion of the permit listing covered sources.[5] Because the CSOs are not specifically listed on page one as permitted sources, NWEA argues, they must not have been encompassed by the permit and are therefore illegal. To follow this reasoning would require the court to read the references to diversion structures out of the permit altogether. The limitations on the frequency of CSO events and the requirement that Portland work towards upgrading its sewer system would then constitute mere surplusage.

The 1984 permit is clear on its face in permitting CSO events under specified conditions. The description of permitted activities specifically allows Portland to operate a sewage system and to discharge through two separate sets of discharge points, those listed on page one as authorized discharge points, and those described and listed in Schedule A.

The extrinsic evidence presented to the district court only strengthens this conclusion. The parties each offered evidence, in the form of affidavits and other documentary evidence, to support their respective understandings of the 1984 permit. NWEA relied mainly on four documents to support the position that the CSOs were not, and had never been, permitted. The first was a letter from W.C. Gaffi, Portland's Chief Engineer, to DEQ in 1988. Gaffi stated that "the City supports ODEQ's position to permit the CSO outfalls through a modification to the existing treatment permit. This approach should achieve the same goal as individual CSO permits and reduce the administrative cost of doing so." E.R. 278. The second document was an October 1990 memorandum from two

---

3. Effluent from outfalls 001 and 002 has been treated before it is discharged into the Columbia River.

4. The parties do not dispute that "diversion structure" refers to the CSOs.

In earlier permits, the 54 CSOs were listed in this provision of the permit. *See* Supp. E.R. 13 (1979 permit, "Discharge at overflow points 003 through 066 is permitted when the flow at diversion structures exceeds three times the dry weather flow."); Supp.E.R. 2 (1974 permit—same).

5. NEA attempts to downplay the importance and placement of the references to diversion structures, implying that they are somehow a part of the fine print. In reality however, the limitations on the frequency of CSO events appears in normal sized type on page two of the permit, directly below the effluent limits for discharges from outfalls 001 and 002. *See*, E.R. 223.

members of the Portland Bureau of Environmental Services. In this memo, Linda MacPherson and Dave Kliewer indicated the need to set up a "discussion to determine if the CSOs are going to be permitted or not?" E.R. 279. The third is an undated memorandum in which a DEQ employee wrote that "the potential exists for permitting both the storm and combined sewer discharges." E.R. 191. NWEA argues that these three documents imply that the CSOs were not covered under the 1984 permit, because if they were, there would be no need to address including them in future permits.

Finally, NWEA offered a DEQ policy statement entitled "Strategy for Regulating Combined Sewer Overflows."[6] The report states that "none of these outfalls [the CSOs] are covered by a permit, however, all are proposed to be addressed in the Portland–Columbia Blvd STP permit renewal." E.R. 208. NWEA argues that this statement proves that DEQ had not permitted the CSOs in the 1984 permit. Portland, however, offered an affidavit by the author of the report to explain the statement. Barbara Burton explained that the quoted text did not mean that Portland's CSOs were not covered by an NPDES permit, and therefore were illegal. Instead, it was intended to convey that "none of the outfalls were individually *listed* with effluent limitations in Portland's 1984 NPDES permit." E.R. 281 (emphasis in original).

Barbara Burton's impression of the scope of the Portland NPDES permit was shared by Harold L. Sawyer, formerly the Water Quality Division Administrator for DEQ. E.R. 282. Sawyer stated in his affidavit that "Portland's entire sewer system, including CSO outfalls, was permitted by Portland's 1984 NPDES permit and by its prior NPDES permits." E.R. 283. According to Sawyer, DEQ knew, and always had known, that the Portland sewer system operated through a system of CSOs and treatment plants. *Id.* Moreover, "if DEQ had considered combined sewer overflows to be outside of Portland's NPDES permit, as Water Quality Division Administrator for DEQ [he]

would have proposed a specific program and schedule for treatment or elimination of such discharges for incorporation in the permit or in a separate compliance order." *Id.* These are the steps that DEQ took in 1991. Thus, "DEQ understood that Portland would continue to operate its combined sewer system as it had been operating the system prior to the existence of the NPDES permitting program, to prevent dry weather combined sewer overflows except during abnormal storm events." *Id.* at 285.

This position is repeated in the 1991 SFO. DEQ stated that "as a matter of policy the Department [DEQ] did not always list CSO discharge points in an NPDES permit but, in many instances, issued permits for an entire sewer system ... [Portland's] 1984 NPDES permit is a permit for the sewer system, which includes CSO outfalls, but did not contain specific effluent limitations for CSOs." E.R. 260–61.

The district court, having reviewed these conflicting statements, found Portland's interpretation to be persuasive. The court recognized the import of the Gaffi letter, but determined that it was "not persuasive enough in the face of the common sense reading of the permit, which when examined in context with the older permits and when construed to give the language limiting discharges meaning, directs a conclusion that the 1984 permit covered the CSO discharges." E.R. 83. The Sawyer and Burton affidavits were more persuasive because their explanations of the 1984 permit comported with the language of the permit itself. *Id.*

NWEA argues that, notwithstanding the extrinsic evidence, under the rules of contract interpretation the court must find that the CSOs were not covered by the 1984 permit. Courts should, if possible, interpret a contract so that its terms will not be illegal. *See* Corbin, *Contracts* § 546 at 169 (1960). This rule is advisory and should not be applied blindly to the detriment of the parties' intentions. "[A] specific provision in an otherwise valid contract should not be given a meaning that would have a legal effect that the court is convinced the parties did not

---

6. This February 1991 document appears to have been prepared in response to the EPA's National Combined Sewer Overflow Control Strategy. *See* 54 Fed.Reg. 37370 (Sept. 8, 1989).

intend, even though any alternative meaning will cause the provision to have no legal effect whatever." *Id.*

Under the regulations promulgated pursuant to § 1342 of the Clean Water Act, all NPDES permits should establish technology-based effluent limitations for all permitted point sources. 40 C.F.R. § 122.44(a). Although technically the permit should have established effluent limitations for the CSOs, it appears that the parties intended to omit such requirements. The district court was presented with sufficient evidence from which it could determine that DEQ, as well as Portland, intended this allegedly unlawful interpretation. EPA approved the terms of the permit, including the absence of effluent limitations for the CSOs, even though the existence of the CSOs was clear on the permit's face. Moreover, prior to 1989, it appears that many state permitting bodies believed that CSO outfalls could be permitted without being subjected to effluent limitations. *See* National Combined Sewer Overflow Control Strategy, 54 Fed.Reg. 37370, 37371 (1989) (proposed regulations to "control effluents from combined systems which are not regulated under the sanitary system standards nor as discharges from separate storm sewer regulations"). *Cf., Montgomery Environmental Coalition v. Costle,* 207 U.S.App.D.C. 233, 646 F.2d 568, 592 (D.C.Cir.1980) (interpreting permit as allowing limited CSO events without effluent limitations).

■ NWEA next argues that the district court erred by failing to interpret the permit in the public interest. This is "a rule of construction rather than one of interpretation, one that for reasons of public policy requires the court to give to a contract that legal operation that is of public advantage, when a choice between that and a less advantageous operation is reasonably open." Corbin, *supra* § 550 at 196. In NWEA's view, the 1984 permit should be interpreted as not allowing the CSOs because "clearly it is not in the public interest to construe a permit so as to authorize the gross pollution of public waterways." Reply at 7. The alternative to the CSOs is a total revamping of the Portland sewer system, the cost of which has

been estimated at as much as 1.2 billion dollars. E.R. 221. Moreover, until such renovations could be completed, if the excess effluent during storms was not released through the CSOs the effluent would "flood[ ] streets and basements." Sunnarborg Aff., Supp.E.R. 21. Although water pollution is unfortunate, it beggars credulity to argue that this alternative is so clearly more in the public interest than the CSO events.

The district court's findings are not clearly erroneous. There was significant evidence from DEQ, the permit author, to indicate that the CSOs were covered in the 1984 permit. Moreover, DEQ's interpretation, that the CSOs were permitted but not separately listed, does not directly conflict with NWEA's offered extrinsic evidence. Given Sawyer's and Burton's explanations, Gaffi and MacPherson's concerns about permitting the CSOs can be explained as concern over whether the CSOs should be expressly listed on new permits. We, accordingly, affirm the district court's finding that the permit authorized limited discharges from the CSOs.

**B. Does NWEA Have a Cause of Action for Water Quality Violations?**

NWEA argues that the district court erred in finding that it did not have jurisdiction over a citizen suit for the enforcement of the water quality maintenance provision of the NPDES permit.

In the court below NWEA argued that, whether or not the CSOs were specifically permitted under the 1984 NPDES permit, Portland had violated and continued to violate conditions of both the 1984 and 1991 NPDES permits. Specifically, NWEA alleged that Portland's CSO events violated a permit condition prohibiting any discharges that would violate Oregon water quality standards. The 1984 permit held, as a condition in Schedule A, that "notwithstanding the effluent limitations established by this permit, no wastes shall be discharged and no activities shall be conducted which will violate Water Quality Standards as adopted in OAR 340–41–445 except in the following defined mixing zone ..." 1984 Permit, E.R. 223. The mixing zone was defined as a 100 foot radius around the discharge point. *Id.* The

1991 permit contained similar limitations but eliminated the mixing zone provision. It also expressly applied the condition to the CSOs. *See* E.R. 235 *and compare with* E.R. 223. NWEA offered declarations and scientific reports that it argued establish continuing violations of the water quality standards in the waters surrounding the CSOs after CSO events. *See, e.g.,* Portland's Response to Interrogatories, E.R. 119 (failure to meet fecal coliform standards); Thutt Aff., E.R. 164 ("not possible to have any CSO event that would not exceed the DEQ's fecal coliform standard"); Rosolie Aff., E.R. 153–54.

The district court never reached the question of Portland's liability for violations of this permit condition. Instead, the district court held that § 505 of the Clean Water Act, 33 U.S.C. § 1365, did not grant federal jurisdiction for the citizen enforcement of water quality violations, "because water quality standards do not equal 'effluent standards or limitations under this chapter.'" E.R. 84. The court concluded that violations of water quality standards may be actionable "only if they are incorporated into an NPDES permit through effluent limitations." E.R. 86. Because the plain language of CWA § 505, the legislative history, and case law support a finding of citizen suit jurisdiction in this case, we reverse on this issue.

■ The plain language of CWA § 505 authorizes citizens to enforce *all* permit conditions. That section provides: "[A]ny citizen may commence a civil action ... (1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under [the Clean Water Act]...." 33 U.S.C. § 1365(a)(1)(A). An effluent standard or limitation includes "(2) an effluent limitation or other limitation under section 1311 ... *or* (6) a permit or condition thereof...." 33 U.S.C. § 1365(f)(2), (f)(6) (emphasis added). This language clearly contemplates citizen suits to enforce "a permit or condition thereof." Portland holds a National Pollutant Discharge Elimination System (NPDES) permit,[7] and the water quality standards are conditions of its permit.

Portland argues that § 505 allows citizens to enforce only those water quality standards that are translated into effluent limitations. To support this argument, Portland reasons that the effluent limitations, which were imposed by the 1972 amendments to the CWA, effectively displaced water quality standards as the primary means of regulating pollution. Portland explains that Congress retained water quality standards as the ultimate goal of pollution control, but sought to achieve this goal through end-of-the-pipe limitations.

Portland misconstrues the effect of the legislative history of the 1972 amendments to the CWA. To be sure, the 1972 CWA amendments reflect Congress' dissatisfaction with the system of water quality standards. But nowhere does Congress evidence an intent to *preclude* the enforcement of water quality standards that have not been translated into effluent discharge limitations. The fact that Congress created a new, simpler enforcement method based on effluent limitations does not mean that Congress intended to foreclose citizen suit enforcement of water quality standards. In fact, the legislative history indicates just the opposite.

By introducing effluent limitations into the CWA scheme, Congress intended to improve enforcement, not to supplant the old system. In the legislative history, the Senate Committee first outlined the dual purposes of water quality standards: "The standards are intended to function ... [a]s a measure of performance ... [and] to provide an avenue of legal action against polluters. If the wastes discharged by polluters reduce water quality below the standards, actions may be begun against the polluters." S.Rep. No. 414, 92nd Cong., 2nd Sess. 2 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3671; 40 C.F.R. § 131.2 (1992) (dual purposes).

Next, the Committee expressed dismay over the "almost total lack of enforcement" under the old system that depended exclusively upon water quality standards. 1972 U.S.C.C.A.N. at 3672 ("[O]nly one case has reached the courts in more than two dec-

---

**7.** As noted above, the NPDES permit program makes it unlawful for any person to discharge a pollutant without obtaining an NPDES permit

from the State and complying with its terms. 33 U.S.C. § 1342.

ades."). Given Congress' concern about *non-enforcement*, Portland erroneously takes a narrow view of Congress' broad provision for "citizen participation in the enforcement of control requirements and regulations established under [the CWA]...." *Id.* at 3745.

The Senate Committee expressly stated that "*[i]n addition to violations of section 301(a)* [33 U.S.C. § 1311, Effluent Limitations] citizens are granted authority to bring enforcement actions for violations of .... *any condition of any permit* issued under section 402 [33 U.S.C. § 1342]." 1972 U.S.C.C.A.N. at 3747 (emphasis added).[8] Also, the Committee explained that it modeled the citizen suit provision on the analogous Clean Air Act ("CAA") provision that applies to air pollution permit conditions.[9] *Id.* at 3745. Thus, consistent with the statutory language, the legislative history of the citizen suit provision reflects Congress' intention to grant *broad* authority for citizen enforcement.

Ample case law supports our view that Congress intended to confer citizens standing to enforce water quality standards. Most notably, in *PUD No. 1 of Jefferson County v. Washington Department of Ecology,* —— U.S. ——, —— – ——, 114 S.Ct. 1900, 1910–14, 128 L.Ed.2d 716 (1994) (*Jefferson County*), the Supreme Court held that the Clean

Water Act allows States to enforce the broad narrative criteria contained in water quality standards. In *Jefferson County,* a county which proposed to build an electricity-generating facility on a river challenged a minimum stream flow condition established by the State.[10] Although the county did not contest the State's authority to set limitations designed to ensure compliance with state water quality standards adopted under CWA § 303, the county argued that § 303 requires the State to protect water quality standards solely through implementation of "specific numerical criteria." *Id.* at ——, 114 S.Ct. at 1910. The county contended that the State may not require it to operate the dam in a manner consistent with a "designated use," which is a *qualitative* requirement of the § 303 water quality standards. *Id.*

The Court rejected the county's argument, and held that the State may require a permit applicant to comply with the qualitative designated uses requirement. *Id.* The Court explained that under the literal terms of CWA § 303(c)(2), a water quality standard must "consist of the designated uses of the navigable waters involved *and* the water quality criteria for such waters based upon such uses." *Id.* Thus, the Court concluded that a project that does not comply with a

---

**8.** *See also Middlesex County Sewerage Authority v. National Sea Clammers,* 453 U.S. 1, 16–17, 101 S.Ct. 2615, 2624–2625, 69 L.Ed.2d 435 (1981) (recognizing that the "broad category of potential plaintiffs" envisioned by Congress in the citizen suit provision "necessarily includes ... plaintiffs seeking to enforce [the CWA] as private attorneys general").

**9.** The Clean Air Act ("CAA") provision authorizes citizen suits for alleged violations of "an emission standard or limitation under [CAA] ... [, defined in relevant part as an] emission limitation, standard of performance or emission standard, ... *or any condition or requirement of a permit* under ... [sections of CAA] ... or under an applicable [state] implementation plan." 42 U.S.C. § 7604(a), (f) (emphasis added).

**10.** Section 401(d) of the Clean Water Act, 33 U.S.C. § 1341(d), authorizes the State to impose conditions for certification of a proposed project based upon several enumerated sections of the Clean Water Act. Although CWA § 303, 33 U.S.C. § 1313, is not one of the statutory provisions listed in CWA § 401(d), the Supreme Court concluded that States may condition § 401(d)

certification upon compliance with § 303. The Court reasoned that because § 401(d) lists § 301 as a provision with which an applicant must comply, and § 301 in turn incorporates § 303 by reference, "state water quality standards adopted pursuant to § 303 are among the 'other limitations' with which a State may ensure compliance through the § 401 certification process." *Jefferson County,* —— U.S. at ——, 114 S.Ct. at 1909.

Section 303 requires that any water quality standard adopted by the State "shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes." 33 U.S.C. § 1313(c)(2).

The State issued a § 401 water quality certification imposing a variety of conditions on the project, including a minimum stream-flow requirement of between 100 and 200 cubic feet per second. The State determined that construction and operation of the project as planned would interfere with one of the designated uses of the river, *viz.,* salmonid migration, rearing, spawning, and harvesting, but that the minimum stream flow requirement would ensure compliance with the § 303 water quality standards.

designated use of the water does not comply with the applicable water quality standards. *Id.* The Court also explained that CWA § 401(d), which provides for State certification of projects, explicitly authorizes "any . . . limitations . . . necessary to assure that [the applicant] will comply with any . . . limitations under . . . [CWA § 303] . . . and any other appropriate requirement of state law." *Id.*

By its holding, the Court expressly rejected the county's argument that designated use requirements are "too open-ended" to be enforceable and that the Clean Water Act only contemplates enforcement of the more "specific and objective" numerical criteria:

> [The county's] argument is belied by the open-ended nature of the criteria themselves . . . criteria are often expressed in broad, narrative terms. . . . In fact, under the Clean Water Act, only one class of criteria, those governing "toxic pollutants listed pursuant to section 1317(a)(1)" need be rendered in numerical form. . . . [The county's] attempt to distinguish between uses and criteria loses much of its force in light of the fact that *the Act permits enforcement of broad, narrative criteria based on, for example, "aesthetics."*

Id. at ——, 114 S.Ct. at 1911 (emphasis added).

The county's losing argument in *Jefferson County* is very similar to the argument advanced by Portland in the instant case. Portland argues that citizens may not enforce the broad narrative conditions of state water quality standards, but may enforce *only* those conditions that have been translated into numeric effluent limitations.

We disagree with Portland's contention that *Jefferson County* is inapposite to the issue before us. Even though *Jefferson County* involved a state's authority to impose conditions under CWA § 401, whereas the present litigation involves citizen suit enforcement of CWA § 402 conditions, both the § 401 certification process and the § 402 permit process require applicants to comply with CWA § 301. As noted above, § 301 incorporates by reference the water quality requirements of § 303.

Moreover, although *Jefferson County* addressed the authority of States, not citizens, to enforce the narrative conditions of CWA § 303 water quality standards, nothing in the language of the Clean Water Act, the legislative history, or the implementing regulations restricts citizens from enforcing the same conditions of a certificate or permit that a State may enforce. To the contrary, as demonstrated above, these sources uniformly support broad citizen enforcement authority, including the authority to enforce water quality standards.

In addition to *Jefferson County*, numerous cases support a finding of citizen suit jurisdiction in this case. The Supreme Court has acknowledged citizen standing under CWA § 505(a)(1) and (f)(6), to enforce permit conditions based on both EPA-promulgated effluent limitations and state-established standards. *See E.P.A. v. California*, 426 U.S. 200, 224–25, 96 S.Ct. 2022, 2033–34, 48 L.Ed.2d 578 (1976). By applying § 505(f)(6), several courts have held that citizens groups may seek to enforce many kinds of permit conditions besides effluent limitations. In fact, permit conditions that courts commonly enforce under § 505(a) are not effluent limitations, but rather, requirements for retaining records of discharge sampling and for filing reports. *See, e.g., Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 (4th Cir.1988) ("Simkins' reporting requirements are expressly made conditions of its permit, and therefore violations of these conditions, by operation of § 1365(f)(6) [CWA § 505(f)(6) ], are violations of an effluent standard or limitation of § 1365(a)."), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989). Other examples of enforceable permit conditions include conditions relating to sewage maintenance, *Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton*, 506 F.Supp. 902 (W.D.Pa.1980), *aff'd*, 644 F.2d 995 (3rd Cir.1981), and construction schedules, *Locust Lane v. Swatara Township Auth.*, 636 F.Supp. 534, 539 (M.D.Pa.1986) (rejecting defendant's attempt "to impose a limitation on § 1365 where one is neither supported by the language nor the legislative history"). Finally, citizens groups may enforce even valid permit conditions that regulate discharges outside the scope of the

Clean Water Act, namely discharges that may never reach navigable waters. *Connecticut Fund For Env't v. Raymark Indus., Inc.,* 631 F.Supp. 1283, 1285 (D.Conn.1986).[11]

Citizen suits to enforce water quality standards effectuate complementary provisions of the CWA and the underlying purpose of the statute as a whole. Citizen suit enforcement of water quality standards is necessary to the effective enforcement of effluent limitations. Congress recognized that water quality standards "often cannot be translated into effluent limitations. . . ." 1972 U.S.C.C.A.N. at 3675. For example, certain water quality standards cannot be expressed quantitatively, such as those that apply in this case to bacterial pollution, aesthetic conditions, and objectionable matter (scum, oily sleek, foul odors, and floating solids). *See* Or.Admin.R. 340–41–445(2)(f), (*l*), (k). Even after the 1972 amendments, states may adopt similar standards and express water quality criteria "as constituent concentrations, levels, or narrative statements. . . ." 40 C.F.R. § 131.3(b) (1992).

Many discharges remain unregulated and primarily subject to water quality standards, despite statutory deadlines for achieving effluent limitations, 33 U.S.C. § 1311(b)(1)(A) (1977 deadline for first-stage effluent limitations on all point source discharges), § 1311(b)(2) (West 1993 Supp.) (1989 deadline for second-stage, more stringent controls). Furthermore, in cases where effluent limitations do apply, they serve only as national, minimum requirements; states may adopt stricter, enforceable water quality standards and limitations. 33 U.S.C. § 1370.

By interpreting § 505 to exclude citizen suit enforcement of water quality standards that are not translated into quantitative limitations, Portland would have us immunize the entire body of qualitative regulations from an important enforcement tool.[12] Such a result would be especially troubling in this case, because no effluent limitations cover the discharges from Portland's combined sewer overflows ("CSOs").[13]

CSOs are the overflow points from combined sewage and stormwater collection systems. Because the number and volume of overflow events from CSO systems are caused primarily by uncontrollable events— *i.e.,* the amount of stormwater entering the system—regulators have no ready way of determining what portion of the flow in a given discharge event is sewage and what portion is rainwater. Without this information, it is impossible to determine the level at which to set a numeric concentration-based permit limit in order to ensure that the gross amount of pollution discharged will not violate water quality standards.

In *Jefferson County,* the Supreme Court recognized that the numerical criteria components of state water quality standards cannot reasonably be expected to address all the water quality issues arising from every activity which can affect the State's hundreds' of individual water bodies. —— U.S. at ——, 114 S.Ct. at 1912. The Court reasoned that requiring the States to enforce only the nu-

---

11. When this Court and other courts have held that citizens may not enforce water quality standards under § 505(a)(1), they addressed standards that were *not included in a NPDES permit. Oregon Natural Resources Council v. U.S. Forest Service,* 834 F.2d 842 (9th Cir.1987) (suit to enforce water quality standards allegedly breached by nonpoint sources, which are never regulated by NPDES permits); *McClellan Ecological Seepage v. Weinberger,* 707 F.Supp. 1182, 1200 (E.D.Cal.1988) (finding no citizen suit jurisdiction existed, because "a state water quality standard can constitute an effluent standard or limitation enforceable under section 505 only if it has been incorporated into an NPDES permit"); *Montgomery Envtl. Coalition Citizens Coordinating Comm. on Friendship Heights v. Washington Suburban Sanitary Comm'n,* 607 F.2d 378, 381 (D.C.Cir.1979).

12. Congress set deadlines for promulgation of effluent limitations, and therefore, must have anticipated a five-year lag, 1972–1977, before universal applicability of effluent limitations. However, nothing in the legislative history indicates that Congress intended to stall citizen enforcement of permit terms until promulgation of effluent limitations.

13. Nor can citizens find consolation in their state court remedy of objecting to the contents of a permit within sixty days of its issuance, Or.Rev. Stat. 183.484(2). Citizens groups such as NWEA might not wish to dispute the issuance or contents of a permit, but to enforce the permit's terms.

merical criteria component of their water quality standards "would in essence require the States to study to a level of great specificity each individual surface water to ensure that the criteria applicable to that water are sufficiently detailed and individualized to fully protect the water's designated uses." *Id.* Accordingly, the Court stated that in the absence of "textual support for imposing this requirement," it was "loath to attribute to Congress an intent to impose this heavy regulatory burden on the States." *Id.*

Because the statutory language, legislative history, and case law authorize citizens to enforce permit conditions stated in terms of water quality standards, we hold that NWEA has standing to enforce the water quality standards contained in Portland's NPDES permit.

### C. Procedural Determinations

■ In the court below, Portland asserted two other jurisdictional arguments upon which NWEA now seeks a determination. Portland argued that 1) the case was moot because of the changes in the 1991 permit; and 2) any action was barred under 33 U.S.C. § 1319(g)(6) by DEQ's subsequent enforcement actions.

Because NWEA claims entitlement to attorney's fees based on the alleged violations of the old permit, and seeks to enforce the water quality standards independently of the effluent limitations, a live and genuine controversy remains, so the case is not moot. With respect to the § 1319(g)(6) defense, the district court did not reach this question, having ruled against NWEA on other grounds. We therefore remand for a determination on this issue.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's holding that the 1984 permit covered the CSOs, and we REVERSE the district court's holding that CWA § 505(a) does not confer jurisdiction for citizen suits to enforce water quality standards when they are conditions of a CWA permit.

AFFIRMED in part, REVERSED in part, and REMANDED.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent from Part II–B of the opinion. I concur in Part II–A.

We decided this case and filed our opinion in 1993, at 11 F.3d 900. As the majority concedes in footnote 1, the full court voted on whether to go en banc, and decided against it. We were required by Federal Rule of Appellate Procedure 41(a) to issue our mandate seven days after entry of the order denying the petition for rehearing. I do not know why this was not done.

The only justification I can see for us to issue a new decision, contrary to our previous one and contrary to what we said in *Oregon Natural Resources Council v. U.S. Forest Service,* 834 F.2d 842 (9th Cir.1987), would be a Supreme Court decision to the contrary. When the Supreme Court makes a decision which renders a decision of ours erroneous, we sometimes recall a mandate and revise our disposition in light of the Supreme Court decision. The majority opinion suggests that *PUD No. 1 of Jefferson County v. Washington Department of Ecology,* —— U.S. ——, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994), has changed the law. If it did with respect to an issue dispositive of the case before us, I would not object to recalling our mandate to correct our error. But it does not.

The question before us is whether citizens' suits may be brought to enforce water quality standards, as opposed to effluent limitations. *Jefferson County* says nothing about that. Basically, water quality standards say that a body of water should be no more polluted than the standard. Effluent limitations say that a particular discharger may discharge no more than the allowed quantity of pollutants. *Jefferson County* does not involve a citizens' suit, says nothing about citizens' suits, and implies nothing about citizens' suits. The question the court decided was whether "the state environmental agency, properly conditioned a permit for the project on the maintenance of specific stream flows to protect salmon and steelhead runs." *Id.* at ——, 114 S.Ct. at 1905. The court decided that EPA's interpretation, "that *activities,* not merely discharges—must comply

with state water quality standards is a reasonable interpretation of § 401, and is entitled to deference." *Id.* at ——, 114 S.Ct. at 1909.

If we were to try to tease something out of *Jefferson County* to assist our decision in this case, we would do better to focus on the Court's discussion of the appropriate use of water quality standards, which is to generate limitations for specific activities. Here is the Court's discussion of the distinction between water quality standards and effluent limitations:

> Washington's Class AA *water quality standards* are typical in that they *contain several open-ended criteria which*, like the use designation of the River as a fishery, *must be translated into specific limitations* for individual projects.

*Id.* at ——, 114 S.Ct. at 1911 (emphasis added); *see also id.* at ——, 114 S.Ct. at 1910 ("States may condition certification *upon any limitations* necessary to ensure compliance with state water quality standards." (emphasis added)).

We have said that only permit limitations derived from water quality standards, not water quality standards themselves, are enforceable by citizens' suits. *Oregon Natural Resources Council v. U.S. Forest Service*, 834 F.2d 842 (9th Cir.1987).

> Thus, *effluent limitations may be derived from water quality standards and may be enforced* when included in a discharger's permit. We agree with defendants that *it is not the water quality standards themselves that are enforceable* in section 1311(b)(1)(C), but it is the "limitations necessary to meet" those standards, or "required to implement" the standards.

*Id.* at 850 (emphasis added).

While our statement in *Oregon Natural Resources Council* may be dictum as applied to the case at bar, I do not see a good reason for deciding the case at bar inconsistently with what we said in *Oregon Natural Resources Council*. The Supreme Court has now analyzed the difference between water quality standards and effluent limitations along the same lines in *Jefferson County*. Judge Ingram's earlier opinion in the case at bar pointed out that "the authorities generally reject citizen suit standing to enforce water quality standards," and appellants "have not been able to find a single case in which a court held that citizens' suits could be used to enforce water quality standards." *Northwest Environmental*, 11 F.3d at 907.

The majority reasons that 33 U.S.C. § 1365 allows citizens' suits for violation of "an effluent standard," and defines "effluent standard" as "a permit or condition thereof," and Portland's permit, in addition to detailed effluent limitations, requires that no wastes be discharged which would violate water quality standards. This reasoning has force, and I am troubled by the difficulty of applying *Oregon Natural Resources Council* in the face of this logical, literal construction.

Nevertheless, we previously concluded on the basis of analysis of several additional provisions of the statute that it is not the permittee who must comply with the water quality standards, but rather the issuing authority, which has a "duty ... to include in the permit end-of-pipe effluent limitations that will ensure that water quality standards are met." *Northwest Environmental*, 11 F.3d at 908. That makes sense in light of what the Supreme Court said in *Jefferson County*. Congress meant for the issuing authority to decide upon end-of-pipe effluent standards for the permit, which it could derive from water quality standards, when Congress allowed citizens' suits to enforce permit limitations. It did not mean for citizens' suits to proceed on the basis of permit violations, where the permittee complied with end-of-pipe discharge limitations but the water still wound up being too polluted. A water quality standard should be deemed to be not among those authorized by the statute for purposes of citizen suit enforcement.

The City of Portland persuasively argues that, if the water quality standard were used as a basis for punishing sewage overflows during rainy weather, then the detailed end-of-pipe discharge limitations in the permit designed for this precise problem would have no practical effect. The City provided evidence that the actual intent of the permit issuing authority and the City of Portland was that the water quality standards lan-

guage was put in for pollutants other than the ones, such as the sewage overflows in rainy weather, known about when the permit was issued. This reading would be consistent with the general principle of treating the specific as overcoming the general. See Karrell v. US, 181 F.2d 981 (9th Cir.1950) (specific provision governs even though general provisions, if standing alone, would include the same subject); International Ass'n of Machinists & Aerospace Workers v. Boeing, 833 F.2d 165, 169 (9th Cir.1987) (same). We should follow the City's persuasive construction of the permit.

The majority's argument from legislative history and policy seems to me to have no force. The history shows that because of the ineffectiveness of water quality standards as a pollution limiting device, Congress decided to change the enforcement mechanism to effluent limitations. See Northwest Environmental, 11 F.3d at 909–11.

The majority argues that as a matter of policy, Congress meant to prevent pollution, and citizens' suits add power to anti-pollution enforcement mechanisms, so there is no reason to deny citizens' suits enforcement. The first two propositions do not imply the third. There can be too much of a good thing. See, e.g., on other subjects, United States ex rel. Miller v. Greer, 789 F.2d 438, 451–52 (7th Cir.1986) (Easterbrook, J., dissenting); National Labor Relations Bd. v. Walton Manufacturing Co., 289 F.2d 177, 182 (5th Cir. 1961) (Wisdom, J., dissenting). There is too much of a good thing when its value is exceeded by the value of other good things available for the same or less cost.

Water quality standards are a useful device for government enforcement authorities (who decided not to prosecute this case against the City of Portland), because they provide standards for effluent limitations and goals toward which enforcement should be aimed. They are too uncertain and amorphous, however, for use against specific polluters. Suppose, hypothetically, that a water quality standard allows for 100 units of a pollutant, upstream and non-point source polluters discharge 50 units, and the downstream discharger is permitted to discharge 50 units. If the upstream and non-point source polluters increase their discharge to 80 units, it does not automatically follow that the downstream discharger should be limited to 20. The burdens of so severe a limitation may exceed the burdens of the extra pollution, or enforcement efforts might more appropriately be directed at the other polluters. In the case at bar, the majority concedes that the social costs of filling the streets and basements of Portland with sewage, or spending between a half billion and $1.2 billion dollars on renovation, are the practical alternatives to tolerating violations of the water quality standards. See Majority Opinion at I–A, II–A. A public authority might rationally decide that filling the streets and basements with sewage is worse than polluting the river with it, and that the citizens of Portland need several years to raise and spend the money necessary to avoid running the sewage into the streets, the basements, and the river.

The reason that this case has not been rendered moot by subsequent changes in the permit which eliminated the basis for the claims is NWEA's claim for attorneys' fees and possibly civil penalties. If the private advocacy group which brought this action prevails on the claim that the City should have done something more than it did under its now-obsolete permit, then it will obtain a great deal of money from the citizens of Portland. This incentive is why citizens' suits may produce too much of a good thing with regard to enforcement.

Suppose, hypothetically, we authorized citizens' suits to enforce highway speed limits. We can all agree that excessive speeds on the highways are undesirable, and that highway patrol officers are too few to ticket all the drivers who speed. We would get more prosecution, and more court cases, than the prudent exercise of discretion would justify. A police officer might exercise discretion not to ticket drivers less than 10 miles per hour over the limit, because the increased danger was negligible, and the enforcement burden to the officer and the courts great. The officer might, however, ticket a speeder with a makeshift towing rig which looked dangerous. The officer and the judge would be pleased to have only one ticket, not hun-

dreds, to dispose of, and the enforcement expense would be small relative to the reduction in danger. A "public interest advocacy group," however, would have an incentive to ticket all the automobiles going a few miles per hour over the limit, because the private group, unlike the police officer and the judge, would have a financial incentive to enforce against the large number of minor violators, even though the burdens of enforcement would be very high relative to the improvement in public safety. A zealous concern for safety on the highways would doubtless contribute to doing well by doing good, but there would be too much good done.

In the case at bar, all the precedents indicate that citizens' suits are not allowable for violations of water quality standards, where those standards are not translated by the permit into effluent limitations. There is no good reason for avoiding application of precedent, and creating new law which allows citizens' suits for purposes of obtaining attorneys' fees and penalties for past violations of water quality standards. We should have left our previous decision alone.