USCA1 Opinion

 

 [NOT FOR PUBLICATION] United States Court of Appeals For the First Circuit ____________________ No. 96-2327 CAPE ANN CITIZENS ASSOCIATION, ET AL., Plaintiffs - Appellants, v. CITY OF GLOUCESTER, ET AL., Defendants - Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Bownes and Cyr, Senior Circuit Judges. _____________________ Philip H. Cahalin for appellants. Madelyn  Morris, Assistant Attorney General, Environmental Protection Division, with whom George  B.  Henderson  II, Assistant United States Attorney, was on brief for appellees Commonwealth of Massachusetts and the United States. Linda Thomas Lowe , General Counsel, Legal Department, City of Gloucester, for appellee City of Gloucester. ____________________ August 13, 1997 ____________________ TORRUELLA, Chief Judge. In 1979, the Commonwealth of Massachusetts ("the Commonwealth") sued the City of Gloucester ("the City") for violating the Massachusetts Clean Water Act, Mass. Gen. Laws ch. 21, SS 26-53. The City agreed to the entry of a final judgment that required it, inter  alia, to prepare a facilities plan to identify and remedy the pollution in North Gloucester. In 1989, the United States brought an action in federal court, alleging that the City was in violation of the Clean Water Act, 33 U.S.C. S 1252 et seq. (CWA). The Commonwealth intervened as a party plaintiff and alleged that the City was violating both the state and federal clean water acts. The complaints in federal court alleged,  inter alia , that the City was discharging pollutants into the waters of the United States and the Commonwealth, in violation of its National Pollutant Discharge Elimination System ("NPDES") permit, issued by the Environmental Protection Agency pursuant to the Clean Water Act. In 1991, the City agreed to the entry of a consent decree. The agreement included a schedule for the design and construction of an extension of the sewer system to North Gloucester. The decree was amended several times thereafter. In 1993, it was amended to give the City discretion to use Septic Tank Effluent Pump ("STEP") sewers rather than a combination of conventional gravity sewers and pressure sewers.  A STEP sewer system includes STEP tanks located on the household's property. Household sewage flows into the STEP tank -2- The City decided to use STEP sewers in the Annisquam and Lane's Cove areas in January 1994. The City initially intended to install all the STEP pumps, tanks, and ancillary equipment needed to connect individual properties to the collection system. The decree was amended in 1995 to reflect this decision. When some homeowners refused to grant the City the easements necessary to allow the City to install the septic tanks and pumps, the City offered them the option of doing the work themselves. As of October 28, 1996, the City had completed the construction of the main and lateral lines of the STEP sewers in Annisquam and approximately seventy percent of the lines for Lane's Cove. Plaintiffs-appellants, the Cape Ann Citizens Association, initiated suit in Massachusetts Superior Court in February 1996. After the suit was brought, the City amended its regulations to allow individual owners to install and maintain their own STEP tanks without conveying an easement to the City. The City removed the action to federal district court. The Commonwealth and the United States intervened as defendants. Treating the matter as a case stated on the pleadings, the district  where it receives primary treatment, essentially consisting of the sludge's settling to the bottom of the tank and being digested by bacteria. The sludge-reduced liquid effluent then flows under pressure to the STEP sewer line and to the city treatment plant. The sewer lines serving STEP sewers are narrower than the lines serving conventional gravity sewers. Conventional gravity sewers convey wastewater, including both liquids and solids, to the treatment plant by means of gravity. Pressure sewers include pumps that grind the sewage before it is transported under pressure to the collection system. -3- court ruled for the City. The plaintiffs now appeal on a variety of grounds. We affirm.  I. Validity of Consent Decree Appellants present several theories in an attempt to have the 1991 consent decree declared void. None of their arguments are persuasive. First, they claim that they have standing to challenge the consent decree under federal law. We need not decide the standing issue as the government agrees that appellant has standing. Assuming arguendo that appellants have standing, we would normally turn to examine the substance of their claim regarding the consent decree. They have, however, failed to put forward a federal claim for relief. They argue only the standing issue, omitting any discussion of a substantive federal claim. In the absence of a federal claim, we consider the state law claim advanced by appellants. The only state law claim presented is based on Mass. Gen. Laws ch. 40, S 53. In relevant part, the statute reads: If a town . . . [is] about to raise or expend money or incur obligations purporting to bind said town for any purpose or object or in any manner other than that for and in which such town has the legal and constitutional right and power to raise or expend money or incur obligations, the supreme judicial court may, upon the petition of not less than  The district court also agreed that appellants had standing to challenge the consent decree on the grounds that the defense of lack of standing was waived when the case was removed to federal court. -4- ten taxable inhabitants of the town, determine the same in equity, and may, before the final determination of the cause, restrain the unlawful exercise or abuse of such corporate power. Mass. Gen. Laws ch. 40, S 53. Appellants' claim fails because it has been brought too late. It is well settled that Mass. Gen. Laws ch. 40, S 53 is preventative. "The statute does not authorize the correction of wrongs wholly executed and completed. It is not retroactive." Fuller v.  Trustees of Deerfield Academy & Dickinson High Sch. , 252 Mass. 258, 259 (1925). Actions under the statute must be brought before obligations are incurred. Kapinos v. Chicopee, 334 Mass. 196, 198 (1956). In Kapinos, the court found that petitioners were not entitled to relief under Mass. Gen. Laws ch. 40, S 53 because "the construction companies had practically completed their work under the contract when this petition was brought." Id. at 199. The construction of the sewers required under the consent decree is similarly advanced. It is undisputed that of approximately 510 homes that must be connected, approximately 450 had been connected as of September 1996. Of those that remain, some will not need to be connected because they have adequate on- site systems. Appellants do not dispute that the sewer system is almost completed. We find, therefore, that Mass. Gen. Laws ch. 40, S 53 does not offer appellants an avenue for relief. Appellants next claim that the consent decree was void on the ground that it was entered into by the mayor  ultra vires . The district court disagreed, stating that "under the city charter of -5- the City of Gloucester, the mayor of the city as the city's chief executive officer was empowered, at least on its face, to enter into the consent decree." Transcript of Hearing, October 28, 1996, at 56. We need not decide the issue, however, because, although appellants discuss their standing to bring such a claim, they fail to argue the merits of their ultra vires claim. It is well settled that this court will consider only those arguments that have been properly briefed and put before it.  [I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace. Willhauck v. Halpin, 953 F.2d 689, 700 (1st Cir. 1991) (citations omitted);  see also  Ramos v.  Roche Prods. , 936 F.2d 43, 51 (1st Cir. 1991) (brief must contain full statement of issues presented and accompanying arguments). Appellants have failed to provide us with argument that supports their  ultra vires claim and, accordingly, we consider that claim to have been waived. II. Did the Consent Decree Violate the CWA? The federal and state clean water acts are administered through a permitting system called the National Pollutant Discharge Elimination System ("NPDES"). Under this system, owners of point -6- sources must obtain an NPDES Permit. Pursuant to the Clean Water Act, 33 U.S.C. S 1251-1387, the EPA issued the City an NPDES permit. Appellants claim that the consent decree is inconsistent with the Clean Water Act because the NPDES permit conditions governing the Gloucester storm drains were not developed in conformity with the Act's regulatory scheme. Because the effluent limitations in the NPDES permit were based upon water quality standards rather than the effluent limitations guidelines promulgated by the EPA, appellants argue that the limits in the permit are unenforceable. Appellants' argument is that "reliance on water quality data alone to enforce the construction of a sewer was inconsistent with the enforcement scheme carefully developed under the Clean Water Act and deprived the district court of jurisdiction of the enforcement action." Appellants' Brief at 11. In other words, appellants argue that only specific effluent limitations stated in  A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. S 1362(14). The permit was originally issued in 1975 and was reissued in 1985. Effluent limitations refer to restrictions on the quantities, rates and concentrations of pollutants which are discharged from a point source. Water quality based standards limit discharges based on the desired conditions of a particular waterway. See Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992). -7- the NPDES permit, and not water quality data, can be enforced by courts. In support of this argument, appellants cite Northwest Environmental  Advocates v. City  of  Portland, 11 F.3d 900, 906-10 (9th Cir. 1993). That case, however, was subsequently vacated by the Ninth Circuit in Northwest Environmental Advocates v. City of Portland, 56 F.3d 979, 981 (9th Cir. 1995), cert.  denied, 116 S. Ct. 2550 (1996). In the latter opinion, the Ninth Circuit concluded, in light of  PUD No. 1 of Jefferson County v.  Washington Department of Ecology , 511 U.S. 700 (1994), that "[b]y introducing effluent limitations into the CWA scheme, Congress intended to improve enforcement, not to supplant the old system." Northwest Environmental Advocates , 56 F.3d at 986. "[N]owhere does Congress evidence an intent to preclude the enforcement of water quality standards that have not been translated into effluent discharge limitations." Id. Furthermore, in PUD No. 1 of Jefferson County , the Supreme Court held that the Clean Water Act allows states to enforce broad water quality standards. Id. at 713-21. In an attempt to rescue their claim, appellants' seek to demonstrate that the CWA is intended to take into account the costs of eliminating the discharge of pollutants. Even assuming that appellants' view of the goals of the CWA is correct, they have nevertheless failed to demonstrate that the consent decree violated the Act. Appellants fail to show that it is impermissible for consent decrees to consider water quality standards. They have also failed to show that the goals of the CWA were ignored when the consent decree was established. We do not believe, as appellants' -8- position would require, that a consent decree must enumerate the objectives of the CWA and state that it has taken each into account. Thus, appellants offer little more than a vacated case, Northwest  Environmental  Advocates, 11 F.3d at 906-10, and a generalized discussion of the goals of the CWA. We find this insufficient to establish that the consent decree violates the CWA. III. Connection to Common Sewer Appellants' next argument alleges that the City's Board of Health lacked the authority to order a landowner to connect to the STEP sewer unless and until the City had installed the STEP tank on the landowner's property. The Board of Health is explicitly granted the authority to order connection to a common sewer: The board of health of a town may require the owner or occupant of any building upon land abutting on a public or private way, in which there is a common sewer, to connect the same therewith by a sufficient drain . . . . Mass. Gen. Laws ch. 83, S 11. Appellants argue that the STEP sewer system is not a "common sewer" for the purpose of section 11 because the sewer system requires, in order to function, the pressure supplied by the individual STEP tanks and requires the pretreatment of sewage provided by these tanks. Accordingly, the argument goes, the STEP tanks are an integral part of the STEP sewer and must be installed before the board of health is empowered to order connection under section 11. -9- In the absence of relevant Massachusetts case law, we find that this argument runs counter to the common sense reading of the term "common sewer." The requirement of pretreatment certainly cannot undermine the authority to order connection under section 11. It is no less a "common sewer" merely because some treatment takes place in the STEP tank -- sewage is still sent through a set of shared pipes to a treatment plant. Similarly, the fact that pressure from the STEP tanks is required for the sewage system to operate does not render it something other than a "common sewer." No authority is cited by appellants for the proposition that the need for pressure from the STEP pumps implies that there is no "common sewer" prior to the STEP tank connection. A sound interpretation of "common sewer" would include the STEP sewer system at issue in which a set of common pipes transport sewage from individual properties to a common treatment facility. Without any support for appellants' argument, we are unwilling to accept their creative interpretation of state law, which would add unprecedented nuances to the plain meaning of the statute. See Doyle v. Hasbro, 103 F.3d 186, 192 (1st Cir. 1996) (stating that this court must exercise caution when considering a new application of state law, and that we will not do so without a strong argument in favor of the desired application). IV. The Takings Claim Appellants argue that the regulations requiring the grant of an easement to the City in exchange for the City's installation -10- of the STEP tanks on homeowners' properties violate the Takings Clause of the Fifth Amendment. The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, see Chicago,  B.  &  Q.R.  Co. v. Chicago, 166 U.S. 226, 239 (1897), provides: "[N]or shall private property be taken for public use, without just compensation." One of the purposes of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United  States, 364 U.S. 40, 49 (1960). On the other hand, the authority of state and local governments to engage in land use planning has been sustained against constitutional challenge. Euclid v.  Ambler Realty Co. , 272 U.S. 365 (1926). "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922).  It is within the power of government to enact land-use regulation, and such regulation does not effect a taking if it "'substantially advance[s] legitimate state interests' and does not den[y] an owner economically viable use of his land." Nollan v. California Coastal Comm'n , 483 U.S. 825, 834 (1987) (quoting  Agins v. Tiburon, 447 U.S. 255, 260 (1980)). "States have broad authority to regulate housing conditions."  Loretto v.  Teleprompter Manhattan  CATV  Corp., 458 U.S. 419, 440 (1982). It follows that -11- the state is entitled to regulate the disposal of sewage in order to protect the public health and to prevent conditions that amount to a nuisance. See Town of Holden v. Holden Suburban Supply Co., 343 Mass. 187, 187 (1961). Every community must find some mechanism to dispose of its sewage. To do so effectively, a sewer system of some form is required, and connection to that system can be mandated without there being a taking. In the instant case, the City's regulation governing the disposal of sewage can be satisfied in one of three ways. First, the homeowner can demonstrate that the sewage treatment on his or her property provides no point source pollution and is in compliance with municipal and state regulations governing sewage systems. Second, the homeowner can install a STEP system at his or her own expense. Third, the homeowner can allow the City to install and maintain the STEP system at its expense upon the granting of an easement allowing the City to come upon the land. In Loretto, the Supreme Court found a taking where New York law required a landlord to allow the installation of cable facilities on his premises. The basic rule applied in Loretto is that "a permanent physical occupation authorized by government is a taking." 458 U.S. at 426. The Court added that "[s]o long as the[] regulations do not require the landlord to suffer the physical invasion of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory government activity." Loretto, 458 U.S. at 440 (citing Penn  Central  Transp.  Co., 438 U.S. 104). By -12- implication, where there is a permanent physical invasion by the government or a third party, there will normally be a taking. The instant case, however, does not fall under the permanent physical invasion rule of Loretto. The important distinction is explained in footnote 19 of Loretto, which states: If S 828 required landlords to provide cable installation if a tenant so desires, the statute might present a different question from the question before us, since the landlord would own the installation. Ownership would give the landlord rights to the placement, manner, use, and possibly the disposition of the installation. The fact of ownership is, contrary to the dissent, not simply "incidental," it would give a landlord (rather than a CATV company) full authority over the installation except only as government specifically limited that authority. The landlord would decide how to comply with applicable government regulations concerning CATV and therefore could minimize the physical, esthetic, and other effects of the installation. Moreover, if the landlord wished to repair, demolish, or construct in the area of the building where the installation is located, he need not incur the burden of obtaining the CATV company's cooperation in moving the cable. Id. at 440 n.19. In the instant case, the homeowner has the option of installing and owning the STEP tanks if the homeowner does not want the City to do so. This option distinguishes the case from Loretto. Because the City could simply order homeowners to connect to the sewer, which would not be a taking, giving them the additional option of having the City perform the installation does not render the regulation a taking. -13- Appellants make much of their claim that even if the system is privately installed, "ownership" of the tanks remains with the City. In fact, appellants appear to concede that there is no taking if the object placed on the homeowner's property is owned by the homeowner. "The critical distinction in  Loretto between use regulations, which are ordinarily noncompensatory, and a 'permanent physical occupation of property,' which is always compensatory, is the ownership and control of the object placed on the homeowner's property." Appellants' Brief at 14. Appellants' argument that the STEP tanks are not privately owned is as follows: The only practical difference between STEP tanks which are considered privately owned . . . and maintained and those which are not is in the identity of the installation and maintenance people. It would seem more would be required to distinguish ownership and control. The tanks clearly perform a public function. The tanks are integral components in the city's sewer. The city's sewer cannot perform its function without the tanks. Appellants' Brief at 14. Appellants have not, however, offered any practical method for distinguishing a privately owned installation and a publicly owned one. We are not convinced by appellants' claim that STEP sewers are different from other sewers because the STEP tanks are required for the system to operate. It is true that the STEP tanks perform the necessary function of allowing solids to settle out of the wastewater before the latter is discharged into the collection system. This function, however, is for the benefit of -14- the homeowner alone. The tank is simply a requirement imposed on the homeowner so that the homeowner's property can be connected to the sewer system. As such, it is not a taking. Rather, it is a reasonable requirement without which the property could not be connected to the sewer. We believe that the option of installing and maintaining the STEP system oneself provides the homeowner ownership of the STEP tank. As discussed in footnote 19 of  Loretto, the homeowner's ability to install the system himself or herself grants the homeowner "full authority over the installation except only as government specifically limited that authority." Id. at 440 n.19. For this reason, and consistent with Loretto, we find that the regulations do not work a taking. V. The Easement Appellants claim that even if there is no taking, there is no need for the City to demand an easement in exchange for one dollar in order to install the STEP tanks. In support of this claim, they cite Mass. Gen. Laws ch. 83, S 1, which allows a city to take an easement by eminent domain if necessary for the construction and maintenance of common sewers. The STEP tanks, however, are not part of a "common sewer," as required by Mass. Gen. Laws ch. 83, S 1. Rather, they are part of a "particular sewer" which is governed by Mass. Gen. Laws ch. 83, SS 3 and 24. See P  &  D  Service  Co. v. Zoning  Board  of  Appeals  of  Dedham, 359 Mass. 96, 101 (1971) (stating that the line connecting a building to a municipal sewer system is a "particular sewer"). The sewer -15- system is, as discussed supra, a common sewer. The STEP tank, however, is more accurately characterized as part of the line connecting a property to the municipal sewer. Sections 3 and 24 do not authorize municipalities to take an easement by eminent domain for the construction of particular sewers. Furthermore, appellants appear to admit that an easement is required. "Early on it became apparent that easements would be necessary for the installation and maintenance of city-owned utilities on private property." Appellants' Brief at xii. VI. Vagueness Finally, appellants claim that the regulations are void for vagueness. Having reviewed the regulations, we find this argument to be without merit. In our view, a person "of ordinary intelligence" is able to understand the meaning of these regulations. United  States v. Batchelder, 442 U.S. 114, 122 (1979);  Doe v.  Superintendent of Schs. of Worcester , 421 Mass. 117, 134 (1995). VII. State Law Issues Two additional issues are raised by appellants: First, that the most the Board of Health can fine a landowner for failure to obey an order to connect to the sewer is $200 and, second, that the City must install the STEP tanks when requested to do so by the homeowner. These issues were not reached by the district court. In its ruling from the bench, the district court stated that "as to any aspects of the case not adjudicated by the declaration from the bench . . . the cause is remanded to the Massachusetts Superior -16- Court." Judgment of the District Court, October 28, 1996. Because appellants do not challenge the propriety of the remand order, we will not consider their arguments on the merits. Accordingly, we leave these issues to the Massachusetts Superior Court. VIII. Conclusion For the reasons stated herein, we  affirm  the judgment of the district court. Costs to appellees. -17-