**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; SANTA MONICA
BAYKEEPER,
          *Plaintiffs-Appellants,*

                    v.

COUNTY OF LOS ANGELES; LOS
ANGELES COUNTY FLOOD CONTROL
DISTRICT; MICHAEL ANTONOVICH, in
his official capacity as Supervisor;
YVONNE BURKE, in her official
capacity as Supervisor; GLORIA
MOLINA, in her official capacity as
Supervisor; ZEV YAROSLAVSKY, in
his official capacity as Supervisor;
DEAN D. EFSTATHIOU, in his
official capacity as Acting
Director of Los Angeles County
Department of Public Works; DON
KNABE, in his official capacity as
Supervisor,
          *Defendants-Appellees.*

No. 10-56017

D.C. No.
2:08-cv-01467-
AHM-PLA

ORDER and
OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
December 10, 2010—Pasadena, California

Filed July 13, 2011

9425

## ORDER

This Court's Opinion, filed March 10, 2011, and published at 636 F.3d 1235 (9th Cir. 2011), is withdrawn and replaced by the attached Opinion.

With this filing, the panel has voted unanimously to deny Appellees' petition for panel rehearing. Judge Pregerson and Judge M. Smith have voted to deny Appellees' petition for rehearing en banc, and Judge Holland so recommends.

The full court has been advised of the Opinion and petition for rehearing en banc, and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Accordingly, Appellees' petition for rehearing or for rehearing en banc is DENIED.

No further petitions for rehearing or rehearing en banc will be entertained in this case.

## OPINION

Before: Harry Pregerson, and Milan D. Smith, Jr., Circuit Judges, and H. Russel Holland, Senior District Judge.*

Opinion by Judge Milan D. Smith, Jr.

---

*The Honorable H. Russel Holland, Senior United States District Judge for the District of Alaska, sitting by designation.

## COUNSEL

Aaron Colangelo, Natural Resources Defense Council, Washington, D.C.; Daniel Cooper, Lawyers for Clean Water, San

Francisco, California, for plaintiffs-appellants Natural Resources Defense Council, Inc. and Santa Monica Baykeeper.

Andrea Sheridan Ordin, Judith A. Fries, Laurie Dods, Los Angeles County Department of County Counsel, Los Angeles, California, Howard Gest, David W. Burhenn, Burhenn & Gest LLP, Los Angeles, California, for defendants-appellees County of Los Angeles, et al.

Gregory Thomas Broderick, Downey Brand, LLP, Sacramento, California, for amicus curiae California State Association of Counties.

Theresa Ann Dunham, Somach Simmons & Dunn, Sacramento, California, for amicus curiae California Stormwater Quality Association.

Kamala D. Harris, Attorney General of California; Kathleen A. Kenealy, Senior Assistant Attorney General; James R. Potter, Jennifer Novak, Deputy Attorneys General, Office of the California Attorney General, Los Angeles, California, for amicus curiae California Regional Water Quality Control Board, Los Angeles Region.

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs-Appellants Natural Resources Defense Council and Santa Monica Baykeeper appeal the district court's grant of summary judgment in favor of two municipal entities that Plaintiffs allege are discharging polluted stormwater in violation of the Federal Water Pollution Control Act (the Clean Water Act, Act, or CWA), 86 Stat. 816, codified as amended at 33 U.S.C. § 1251 *et seq.* Plaintiffs contend that Defendants-

Appellees County of Los Angeles (County) and Los Angeles County Flood Control District (District) are discharging polluted urban stormwater runoff collected by municipal separate storm sewer systems (ms4) into navigable waters in Southern California. The levels of pollutants detected in four rivers—the Santa Clara River, the Los Angeles River, the San Gabriel River, and Malibu Creek (collectively, the Watershed Rivers) —exceed the limits allowed in a National Pollutant Discharge Elimination System (NPDES) permit which governs municipal stormwater discharges in the County. Although all parties agree that numerous water-quality standards have been exceeded in the Watershed Rivers, Defendants contend that there is no evidence establishing their responsibility for, or discharge of, stormwater carrying pollutants to the rivers. The district court agreed with Defendants and entered a partial final judgment.

We conclude that the district court erred with respect to the evidence of discharges by the District into two of the Watershed Rivers—the Los Angeles River and San Gabriel River. Specifically, Plaintiffs provided evidence that the monitoring stations for the Los Angeles and San Gabriel Rivers are located in a section of ms4 owned and operated by the District and, after stormwater known to contain standards-exceeding pollutants passes through these monitoring stations, this polluted stormwater is discharged into the two rivers. Accordingly, Plaintiffs were entitled to summary judgment on the District's liability for discharges into the Los Angeles River and San Gabriel River, and therefore we reverse the district court's grant of summary judgment in favor of the District on these claims.

Plaintiffs, however, failed to meet their evidentiary burden with respect to discharges by the District into the Santa Clara River and Malibu Creek. Plaintiffs did not provide evidence sufficient for the district court to determine if stormwater discharged from an ms4 controlled by the District caused or contributed to pollution exceedances located in these two rivers.

Similarly, Plaintiffs did not delineate how stormwater from ms4s controlled by the County caused or contributed to exceedances in any of the Watershed Rivers. Accordingly, we affirm the district court's grant of summary judgment in favor of the Defendants on these claims.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.   Stormwater Runoff in Los Angeles County

### A.   The MS4

Stormwater runoff is surface water generated by precipitation events, such as rainstorms, which flows over streets, parking lots, commercial sites, and other developed parcels of land. Whereas natural, vegetated soil can absorb rainwater and capture pollutants, paved surfaces and developed land can do neither. When stormwater flows over urban environs, it collects "suspended metals, sediments, algae-promoting nutrients (nitrogen and phosphorus), floatable trash, used motor oil, raw sewage, pesticides, and other toxic contaminants[.]" *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840 (9th Cir. 2003). This runoff is a major contributor to water pollution in Southern California rivers and the Pacific Ocean and contributes to the sickening of many ocean users each year.

The County is a sprawling 4,500 square-mile amalgam of populous incorporated cities and significant swaths of unincorporated land. The District is a public entity governed by the Los Angeles County Board of Supervisors and the Department of Public Works. The District is comprised of 84 cities and some unincorporated areas of the County. The County and the District are separate legal entities.

In the District, stormwater runoff is collected by thousands of storm drains located in each municipality and channeled to a storm sewer system. The municipalities in the District oper-

ate ms4s[1] to collect and channel stormwater. The County also operates an ms4 for certain unincorporated areas. Unlike a sanitary sewer system, which transports municipal sewage for treatment at a wastewater facility, or a combined sewer system, which transports sewage and stormwater for treatment, ms4s contain and convey only untreated stormwater. *See* 40 C.F.R. § 122.26(a)(7), (b)(8). In the County, municipal ms4s are "highly interconnected" because the District allows each municipality to connect its storm drains to the District's extensive flood-control and storm-sewer infrastructure (the MS4).[2] That infrastructure includes 500 miles of open channels and 2,800 miles of storm drains. The length of the MS4 system and the locations of all storm drain connections are not known exactly because a comprehensive map of the storm drain system does not exist. While the number and location of storm drains are too numerous to catalogue, it is undisputed that the MS4 collects and channels stormwater runoff from

---

[1]Under Federal Regulations, an ms4 is:

a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains):

(i) Owned or operated by a State, city, town, borough, county, parish, district, association, or other public body . . . having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity . . .

(ii) Designed or used for collecting or conveying storm water;

(iii) Which is not a combined sewer; and

(iv) Which is not part of a Publicly Owned Treatment Works (POTW) . . . .

40 C.F.R. § 122.26(b)(8).

[2]Throughout this Opinion, reference is made to both "ms4" and "*the* MS4." The former is a generic reference to municipal separate storm sewer systems without regard to their particular location, while the latter specifically refers to the flood control and storm-sewer infrastructure described *supra* that exists in the County and is controlled by the District.

across the County. That stormwater is channeled in the MS4 to various watercourses including the four Watershed Rivers at the heart of this litigation: the Los Angeles River, the San Gabriel River, the Santa Clara River, and Malibu Creek. The Watershed Rivers drain into the Pacific Ocean at Santa Monica Bay, Los Angeles Harbor, and Long Beach Harbor.

The gravamen of Plaintiffs' action is that by allowing untreated and heavily-polluted stormwater to flow unabated from the MS4 into the Watershed Rivers, and eventually into the Pacific Ocean, Defendants have violated the Clean Water Act.

## B.    The Clean Water Act and NPDES Permit

The Clean Water Act is the nation's primary water-pollution-control law. The Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "To serve those ends, the Act prohibits 'the discharge of any pollutant by any person' unless done in compliance with some provision of the Act." *S. Fl. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) (quoting 33 U.S.C. § 1311(a)). "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source[.]" 33 U.S.C. § 1362(12); *see Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993) (characterizing "discharge" as " 'add[ing]' pollutants from the outside world to navigable water").

Under the Clean Water Act, ms4s fall under the definition of "point sources." 33 U.S.C. § 1362(14). A point source is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

A person or entity wishing to add pollutants to navigable waters must comply with the NPDES, which "requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *Miccosukee Tribe*, 541 U.S. at 102; 33 U.S.C. § 1342(a), (p). The Act "generally prohibits the 'discharge of any pollutant' . . . *from a 'point source'* into the navigable waters of the United States' " unless the point source is covered by an NPDES permit. *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1163 (9th Cir. 1999) (quoting 33 U.S.C. §§ 1311(a), 1362(12)(A)) (emphasis added); *see also Arkansas v. Oklahoma*, 503 U.S. 91, 101-02 (1992) (describing NPDES permitting system). An NPDES permit requires its holder—the "permittee"—to follow the requirements of numerous Clean Water Act provisions, *see* 33 U.S.C. § 1342(a), which include effluent limitations, water-quality standards, water monitoring obligations, public reporting mechanisms, and certain discharge requirements. *See id.* §§ 1311, 1312, 1314, 1316, 1317, 1318, 1343.

The Act uses two water-quality-performance standards, by which a discharger of water may be evaluated—"effluent limitations" and "water quality standards." *Arkansas v. Oklahoma*, 503 U.S. at 101 (citing 33 U.S.C. §§ 1311, 1313, 1314); *see also Sierra Club v. Union Oil Co. of Calif.*, 813 F.2d 1480, 1483 (9th Cir. 1987), *vacated on other grounds*, 485 U.S. 931 (1988), *reinstated*, 853 F.2d 667 (9th Cir. 1988). An effluent limitation is "any restriction established by a State or the [Environmental Protection Agency (EPA)] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters. . . ." 33 U.S.C. § 1362(11). An effluent-limitation guideline is determined in light of " 'the best practicable control technology currently available.' " *Union Oil*, 813 F.2d at 1483 (quoting 33 U.S.C. § 1311(b)(1)(A)).

Water-quality standards "are used as a supplementary basis for effluent limitations, so that numerous dischargers, despite

their individual compliance with technology-based limitations, can be regulated to prevent water quality from falling below acceptable levels." *Union Oil*, 813 F.2d at 1483 (citing *EPA v. Calif. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 n.12 (1976) (hereafter *EPA v. Calif.*)). Water-quality standards are developed in a two-step process. First, the EPA, or state water authorities establish a waterway's "beneficial use." *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993); *see also* Cal. Water Code § 13050(f) ("'Beneficial uses' of the waters of the state that may be protected against quality degradation include, but are not limited to, domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves."). Once the beneficial use is determined, water quality criteria that will yield the desired water conditions are formulated and implemented. *See NRDC v. EPA*, 16 F.3d at 1400; *see also* 33 U.S.C. § 1313(a), (c)(2)(A); 40 C.F.R. § 131.3(i) ("Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses.").

Unlike effluent limitations, which are promulgated by the EPA to achieve a certain level of pollution reduction in light of available technology, water-quality standards emanate from the state boards charged with managing their domestic water resources. *See Arkansas v. Oklahoma*, 503 U.S. at 101. The EPA gives the states guidance in drafting water-quality standards and "state authorities periodically review water quality standards and secure the EPA's approval of any revisions in the standards." *Id.*

The EPA has authorized the State of California to develop water-quality standards and issue NPDES permits. Under the Porter-Cologne Water Quality Control Act, California state law designates the State Water Resources Control Board and nine regional boards as the principal state agencies for enforc-

ing federal and state water pollution law and for issuing permits. *See* Cal. Water Code §§ 13000, 13001, 13140, 13240, 13370, 13377. Beginning in 1990, the California State Water Resources Control Board for the Los Angeles Region (the Regional Board) issued an NPDES permit (the Permit) to cover stormwater discharges by the County, the District, and 84 incorporated municipalities in the County (collectively the Permittees or Co-Permittees).[3] *See City of Arcadia v. State Water Res. Control Bd.*, 119 Cal. Rptr. 3d 232, 240-41 (Cal. Ct. App. 2010). The Permit was renewed in 1996, 2001, 2006, and 2007.

The Permit is divided into two broad sections: findings by the Regional Board and an order authorizing and governing the Permittees' discharges (Order). The findings cover many introductory and background subjects, including a history of NPDES permitting in the County; applicable state and federal laws governing stormwater discharges; studies conducted by the County and researchers about the deleterious effects of polluted stormwater; coverage and implementation provisions; and guidelines for administrative review of Permit provisions. The Permit covers "all areas within the boundaries of the Permittee municipalities . . . over which they have regulatory jurisdiction as well as unincorporated areas in Los Angeles County within the jurisdiction of the Regional Board." In total, the Permit governs municipal stormwater discharge across more than 3,100 square miles of land in the County.

The Permit relates the many federal and state regulations governing stormwater discharges to Southern California's watercourses. Among these regulations is the Water Quality Control Plan for the Los Angeles Region (the Basin Plan). Under California law, the regional boards' "water quality plans, called 'basin plans,' must address the beneficial uses to

---

[3]"Co-permittee means a permittee to a NPDES permit that is only responsible for permit conditions relating to the discharge for which it is operator." 40 C.F.R. § 122.26(b)(1).

be protected as well as water quality objectives, and they must establish a program of implementation." *City of Arcadia*, 119 Cal. Rptr. 3d at 240 (quoting *City of Burbank v. State Water Res. Control Bd.*, 108 P.3d 862, 865 (Cal. 2005) (citing Cal. Water Code § 13050(j))). The Permit provides that "[t]he Basin Plan designates beneficial uses of receiving waters and specifies both narrative and numerical water quality objectives for the receiving water in Los Angeles County." "Receiving waters" are defined as all surface water bodies in the Los Angeles Region that are identified in the Basin Plan. Permittees are to assure that storm water discharges from the MS4 shall neither cause nor contribute to the exceedance of water quality standards and objectives nor create conditions of nuisance in the receiving waters, and that the discharge of non-storm water to the MS4 has been effectively prohibited. The Permit incorporates and adopts the Basin Plan, which sets limits on bacteria and contaminants for the receiving waters of Southern California. The water-quality standards limit, among other pollutants, the levels of ammonia, fecal coliform bacteria, arsenic, mercury, and cyanide in Southern California's inland rivers.

The Permit contains myriad prohibitions and conditions regarding discharges into and from the MS4. Under Part 1, the Permittees are directed to "effectively prohibit non-storm water discharges into the MS4 and watercourses" unless allowed by an NPDES permit. Under Part 2, titled "Receiving Water Limitations," "discharges from the MS4 that cause or contribute to the violation of the Water Quality Standards or water quality objectives are prohibited." The "Water Quality Standards and Water Quality Objectives" are defined in the Permit as "water quality criteria contained in the Basin Plan, the California Ocean Plan, the National Toxics Rule, the California Toxics Rule, and other state or federal approved surface water quality plans. Such plans are used by the Regional Board to regulate all discharges, including storm water discharges."

The Permit, in Part 2.3, provides that Permittees "shall comply" with the MS4 discharge prohibitions, set forth in Parts 2.1 and 2.2, "through timely implementation of control measures and other actions to reduce pollutants in the discharges in accordance with [the Los Angeles Stormwater Quality Management Program (SQMP)] and its components and other requirements of this Order. . . ." The SQMP includes "descriptions of programs, collectively developed by the Permittees in accordance with provisions of the NPDES Permit, to comply with applicable federal and state law." Part 2.3 further provides that "[i]f exceedances of Water Quality Objectives or Water Quality Standards [ ] persist, notwithstanding implementation of the SQMP and its components and other requirements of this permit," Permittees "shall assure compliance with discharge prohibitions and receiving water limitations" by engaging in an "iterative process" procedure:

> a) Upon a determination by either the Permittee or the Regional Board that discharges are causing or contributing to an exceedance of an applicable Water Quality Standard, the Permittee shall promptly notify and thereafter submit a Receiving Water Limitations (RWL) Compliance Report . . . to the Regional Board that describes [Best Management Practices (BMPs)] that are currently being implemented and additional BMPs that will be implemented to prevent or reduce any pollutants that are causing or contributing to the exceedances of Water Quality Standards.

> . . .

> c) Within 30 days following the approval of the RWL Compliance Report, the Permittee shall revise the SQMP and its components and monitoring program to incorporate the approved modified BMPs that have been and will be implemented, an imple-

mentation schedule, and any additional monitoring required.

d) Implement the revised SQMP and its components and monitoring program according to the approved schedule.

[Part 2.4] So long as the Permittee has complied with the procedures set forth above and is implementing the revised SQMP and its components, the Permittee does not have to repeat the same procedure for continuing or recurring exceedances of the same receiving water limitations unless directed by the Regional Board to develop additional BMPs.

When a violation arises, a Permittee must adhere to the procedures in its Compliance Report until the exceedances abate.

Part 3 of the Permit, titled "Storm Water Quality Management Program (SQMP) Implementation," provides that "[e]ach Permittee shall, at a minimum, implement the SQMP." Part 3.A.3 requires Permittees to "implement additional controls, where necessary, to reduce the discharge of pollutants in storm water to the [Maximum Extent Practicable (MEP)]." Part 3.B requires the implementation of BMPs by the Permittees. Part 3.G specifies that each Permittee is vested with the "necessary legal authority" to prohibit discharges to the MS4, and the Permittees are directed to develop storm-water and urban runoff ordinances for its jurisdiction.

The Permit has both self-monitoring and public-reporting requirements, which include: (1) monitoring of "mass emissions" at seven mass emission monitoring stations; (2) Water Column Toxicity Monitoring; (3) Tributary Monitoring; (4) Shoreline Monitoring; (5) Trash Monitoring; (6) Estuary Sampling; (7) Bioassessment; and (8) Special Studies.

This case concerns high levels of pollutants, particularly heavy metals and fecal bacteria, identified by mass-emissions

monitoring stations for the four Watershed Rivers (the Monitoring Stations). Mass-emissions monitoring measures *all* constituents present in water, and the readings give a cumulative picture of the pollutant load in a waterbody. According to the Permit, the purpose of mass-emissions monitoring is to (1) estimate the mass emissions from the MS4, (2) assess trends in the mass emissions over time, and (3) determine if the MS4 is contributing to exceedances of Water Quality Standards by comparing results to the applicable standards in the Basin Plan. The Permit establishes that the Principal Permittee, which is the District, shall monitor the mass-emissions stations. The Permit requires that mass-emission readings be taken five times per year for the Watershed Rivers.

The Los Angeles River and San Gabriel River Monitoring Stations are located in a channelized portion of the MS4 that is owned and operated by the District. *See* Excerpts of Record at 11; *see also* Dist. Ct. Docket No. 101: Declaration of Aaron Colangelo Ex. N: Deposition of Mark Pestrella at 476-78. The Los Angeles River Monitoring Station is located in the City of Long Beach in "a concrete lined trapezoidal channel."[4] The Los Angeles River Monitoring Station measures "total upstream tributary drainage" of 825 square miles, as the Los Angeles River is the largest watershed outlet in the County. The San Gabriel River Monitoring Station is located in Pico Rivera and measures an upstream tributary watershed of 450 square miles.

The Malibu Creek Monitoring Station is not located within a channelized portion of the MS4 but at an "existing stream gage station" near Malibu Canyon Road. It measures 105

---

[4]"Section Two: Site Descriptions," Los Angeles Cnty. Dept. of Pub. Works, *available at* http://dpw.lacounty.gov/wmd/npdes/9899_report/ SiteDesc.pdf (last accessed July 6, 2011); *see also* "Section Two: Site Descriptions," Los Angeles Cnty. Dept. of Pub. Works, *available at* http://dpw.lacounty.gov/wmd/NPDES/2006-07_report%5CSection %202.pdf (last accessed July 6, 2011).

miles of tributary watershed. The Santa Clara River Monitoring Station is located in the City of Santa Clara and measures an upstream tributary area of 411 square miles.[5]

## C.    Water-Quality Exceedances in the Watershed Rivers

Between 2002 and 2008, the four Monitoring Stations identified hundreds of exceedances of the Permit's water-quality standards. These water-quality exceedances are not disputed. For instance, monitoring for the Los Angeles and San Gabriel Rivers showed 140 separate exceedances. These included high levels of aluminum, copper, cyanide, fecal coliform bacteria, and zinc in the rivers. Further, ocean monitoring at Surfrider Beach showed that there were 126 separate bacteria exceedances on 79 days, including 29 days where the fecal coliform bacteria limit was exceeded.

The District admits that it conveys pollutants via the MS4, but contends that its infrastructure alone does not generate or discharge pollutants. According to Defendants, the District conveys the collective discharges of the numerous "up-sewer" municipalities. Moreover, Defendants identify thousands of permitted dischargers whose pollutants are reaching the Watershed Rivers:

> (1) Los Angeles River watershed: (a) at least 1,344 NPDES-permitted industrial and 488 construction stormwater dischargers allowed to discharge during the time period relevant to the case; (b) three wastewater treatment plants; and (c) 42 separate incorporated cities within the Los Angeles River watershed discharging into the river upstream of the mass emission station.

---

[5]"Section Two: Site Descriptions," Los Angeles Cnty. Dept. of Pub. Works, *available at* http://dpw.lacounty.gov/wmd/NPDES/2006-07_ report%5CSection%202.pdf (last accessed July 6, 2011).

(2) San Gabriel River watershed: (a) at least 276 industrial and 232 construction stormwater dischargers during the relevant time period; (b) at least 20 other industrial dischargers that were specifically permitted to discharge pollutants in excess of the water quality standards at issue in this action; (c) two wastewater treatment plants; and (d) 21 separate incorporated cities discharging into the watershed upstream of the mass emission station.

(3) Santa Clara River watershed: (a) eight dischargers permitted by industrial wastewater discharge permits where the limits in the permit allowed discharges of pollutants at concentrations higher than the water quality standards which plaintiffs contend were exceeded; (b) approximately 26 industrial and 187 construction stormwater dischargers; and (c) the Saugus Wastewater Reclamation Plant.

(4) Malibu Creek watershed: (a) seven industrial wastewater dischargers; and (b) at least five permitted discharges under the general industrial stormwater permit and at least 16 construction sites permitted to discharge under the general construction stormwater permit.

## II.   Proceedings before the District Court

Based on data self-reported by Defendants, Plaintiffs catalogued the water-quality exceedances in the Watershed Rivers. Beginning on May 31, 2007, Plaintiffs sent a series of notice letters to Defendants concerning these exceedances. On March 3, 2008, based on these purported violations, Plaintiffs commenced this citizen-enforcement action. After the district court dismissed certain elements of Plaintiffs' initial complaint because notice of the Permit violations was defective, Plaintiffs sent Defendants an adequate notice letter on July 3, 2008.

Plaintiffs filed the First Amended Complaint (Complaint) on September 18, 2008. In the Complaint, Plaintiffs assert six causes of action under the Clean Water Act. Only the first four of Plaintiffs' claims, which relate to the exceedances in the Watershed Rivers, and which the district court designated the "Watershed Claims," are before us. The first three Watershed Claims allege that, beginning in 2002 or 2003, the District and the County caused or contributed to exceedances of water-quality standards in the Santa Clara River (Claim 1), the Los Angeles River (Claim 2), and the San Gabriel River (Claim 3), in violation of 33 U.S.C. §§ 1311(a), 1342(p). The fourth Watershed Claim alleges that, beginning in 2002, Defendants caused or contributed to exceedances of the water quality standards and violated the Total Maximum Daily Load (TMDL) limits in Malibu Creek. Plaintiffs' four Watershed Claims each rest on the same premise: (1) the Permit sets water-quality limits for each of the four rivers; (2) the mass-emissions stations have recorded exceedances of those standards; (3) an exceedance is non-compliance with the Permit and, thereby, the Clean Water Act; and (4) Defendants, as holders of the Permit and operators of the MS4, are liable under the Act.

Before the district court, Plaintiffs moved for partial summary judgment on two of the Watershed Claims: the Los Angeles River and San Gabriel River exceedances. Defendants cross-moved for summary judgment on all four Watershed Claims.

In a March 2, 2010 Order, the district court denied each cross-motion for summary judgment on the Watershed Claims. *NRDC v. County of Los Angeles*, No. 08 Civ. 1467 (AHM), 2010 WL 761287 (C.D. Cal. Mar. 2, 2010), *amended on other grounds*, 2011 WL 666875 (C.D. Cal. Jan. 27, 2011). Although the district court accepted Plaintiffs' arguments that the Permit "clearly prohibits 'discharges from the MS4 that cause or contribute to the violation of Water Quality Standards or water quality objectives,' " 2010 WL 761287, at *6,

and that mass-monitoring stations "are the proper monitoring locations to determine if the MS4 is contributing to exceedances [of the Water Quality Standards or water quality objectives,]" *id.*, the district court held that Plaintiffs were attempting to establish liability without presenting evidence of who was responsible for the stormwater discharge. The district court observed that although "the District is responsible for the pollutants in the MS4" at the time they pass the mass-emissions stations, "that does not necessarily determine the question of whether the water passing by these points is a 'discharge' within the meaning of the Permit and the Clean Water Act." *Id.* at *7. Unable to decipher from the record where the MS4 ended and the Watershed Rivers begin, or whether any upstream outflows were contributing stormwater to the MS4, the district court stated that "Plaintiffs would need to present some evidence (monitoring data or an admission) that some amount of a standards-exceeding pollutant is being discharged though at least one District outlet." *Id.* at *8.

Following supplemental briefing, the district court again determined that "Plaintiffs failed to present evidence that the standards-exceeding pollutants passed through the Defendants' MS4 *outflows* at or near the time the exceedances were observed. Nor did Plaintiffs provide any evidence that the mass emissions stations themselves are located at or near a Defendant's outflow." The district court thereupon entered summary judgment for Defendants on all four Watershed Claims.

Under Fed. R. Civ. P. 54(b), the district court entered a partial final judgment on the Watershed Claims because they were "factually and legally severable" from the other claims and "[t]he parties and the Court would benefit from appellate resolution of the central legal question underlying the watershed claims: what level of proof is necessary to establish defendants' liability." Plaintiffs timely appeal.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.

We review the district court's grant of summary judgment in a Clean Water Act enforcement action de novo. *Assoc. to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002) (citing *Waste Action Project v. Dawn Mining Corp.*, 137 F.3d 1426, 1428 (9th Cir. 1998)).

## DISCUSSION

Determining whether the County or the District violated the Permit's conditions, and thereby the Clean Water Act, requires us to examine whether an exceedance at a mass-emission monitoring station is a Permit violation, and, if so, whether it is beyond dispute that Defendants discharged pollutants that caused or contributed to water-quality exceedances.

## I.  Whether Exceedances at Mass-Emission Stations Constitute Permit Violations

**[1]**  "The Clean Water Act regulates the discharge of pollutants into navigable waters, prohibiting their discharge unless certain statutory exceptions apply." *Russian River Watershed Protection Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1138 (9th Cir. 1998) (citing 33 U.S.C. § 1311(a)). One such exception is for discharges by entities or individuals who hold NPDES permits. *Id.* The NPDES permitting program is the "centerpiece" of the Clean Water Act and the primary method for enforcing the effluent and water-quality standards established by the EPA and state governments. *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 990 (D.C. Cir. 1997); *see also Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986-90 (9th Cir. 1995) ("Citizen suits to enforce water quality standards effectuate complementary provisions of the CWA and the

underlying purpose of the statute as a whole."); *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1225 (11th Cir. 2009) (citing *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156,175-76 (D.C. Cir. 1982) ("There is indeed some basis in the legislative history for the position that Congress viewed the NPDES program as its most effective weapon against pollution.")).

To decipher the meaning and enforceability of NPDES permit terms, we interpret the unambiguous language contained in the permit. *Russian River*, 142 F.3d at 1141. We review a permit's provisions and meaning as we would any contract or legal document. *See Nw. Envtl. Advocates*, 56 F.3d at 982. As described *supra*, the Permit prohibits MS4 discharges into receiving waters that exceed the Water Quality Standards established in the Basin Plan and elsewhere. Specifically, Section 2.1 provides: "[D]ischarges from the MS4 that cause or contribute to the violation of Water Quality Standards or water quality objectives are prohibited." Section 2.2 of the Permit reads: "Discharges from the MS4 of storm water, or non-storm water, for which a Permittee is responsible for, shall not cause or contribute to a condition of nuisance."

Nevertheless, Defendants contend that exceedances observed at mass-emissions stations cannot establish liability on behalf of any individual Permittee. Their argument in this respect, as we discuss more thoroughly *infra*, relies heavily on their belief that the record is bereft of evidence connecting Defendants to the water-quality exceedances. Defendants also assert that the mass-emissions stations are "neither designed nor intended" to measure the compliance of any Permittee and, therefore, cannot form the basis for a Permit violation. Defendants also argue that municipal compliance with an NPDES stormwater permit cannot be reviewed under the same regulatory framework as a private entity or an individual. In support of this contention, Defendants cite to a 1990 EPA rule:

> When enacting this provision, Congress was aware
> of the difficulties in regulating discharges from
> municipal separate storm sewers solely through tra-
> ditional end-of-pipe treatment and intended for EPA
> and NPDES States to develop permit requirements
> that were much broader in nature than requirements
> which are traditionally found in NPDES permits for
> industrial process discharges or POTWs. The legisla-
> tive history indicates, municipal storm sewer system
> "permits will not necessarily be like industrial dis-
> charge permits." Often, an end-of-the-pipe treatment
> technology is not appropriate for this type of dis-
> charge.

Brief of Appellees 33 (quoting "National Pollutant Discharge
Elimination System Permit Application Regulations for Storm
Water Discharges," 55 Fed. Reg. 47,990, 48,037-38 (Nov. 16,
1990)).

As we detail *infra*, neither the statutory development of the
Clean Water Act nor the plain language of EPA regulations
supports Defendants' arguments that NPDES permit viola-
tions are less enforceable or unenforceable in the municipal-
stormwater context. In fact, since the inception of the NPDES,
Congress has expanded NPDES permitting to bring municipal
dischargers within the Clean Water Act's coverage.

## A.   Regulating MS4 Operators

The NPDES permitting program originated in the 1972
amendments to the Clean Water Act. Pub. L. 92-500, § 2, 86
Stat. 88, *reprinted in* 1972 U.S.C.C.A.N. 3668 (codified as
amended at 33 U.S.C. § 1342). At the time, the NPDES pro-
gram was viewed "as the primary means of enforcing the
Act's effluent limitations." *Natural Res. Def. Council v.
Costle*, 568 F.2d 1369, 1371 (D.C. Cir. 1977); *see also Natu-
ral Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1295 (9th
Cir. 1992) (examining statutory history of 1972 amendments

to the Clean Water Act) (hereafter *NRDC v. EPA*). The per-mitting program is codified at Section 402 of the Clean Water Act. 33 U.S.C. § 1342. In 1973, the EPA promulgated regula-tions categorically exempting "discharges from a number of classes of point sources . . . including . . . separate storm sew-ers containing only storm runoff uncontaminated by any industrial or commercial activity." *Costle*, 568 F.2d at 1372 (citing 40 C.F.R. § 125.4 (1975)). The EPA's exemption of certain point sources, including ms4s, from Section 402's blanket requirement was invalidated by the United States Court of Appeals for the District of Columbia Circuit in *Costle*. *Id.* at 1376-77. The *Costle* court highlighted that "[t]he wording of the [CWA], legislative history, and precedents are clear: the EPA Administrator does not have authority to exempt categories of point sources from the permit require-ments of § 402." *Id.* at 1377.

In the ten-year period following the *Costle* decision, the EPA did not promulgate regulations addressing discharges by ms4 operators. *See NRDC v. EPA*, 966 F.2d at 1296 (citing "National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges; Appli-cation Deadlines," 56 Fed. Reg. 56,548 (1991)). In 1987, after continued nonfeasance by the EPA, Congress enacted the Water Quality Act amendments to the Clean Water Act to regulate stormwater discharges from, *inter alia*, ms4s. *See Defenders of Wildlife*, 191 F.3d at 1163 ("Ultimately, in 1987, Congress enacted the Water Quality Act amendments to the CWA."); *NRDC v. EPA*, 966 F.2d at 1296 ("Recognizing both the environmental threat posed by storm water runoff and EPA's problems in implementing regulations, Congress passed the Water Quality Act of 1987[.]") (internal citations omitted); *see also* 55 Fed. Reg. 47,994 ("[P]ermits for dis-charges from municipal separate storm sewer systems must require controls to reduce the discharge of pollutants to the maximum extent practicable, and where necessary water quality-based controls, and must include a requirement to effectively prohibit non-storm water discharges into the storm

sewers. Furthermore, EPA in consultation with State and local officials must develop a comprehensive program to designate and regulate other storm water discharges to protect water quality.").

**[2]** The principal effect of the 1987 amendments was to expand the coverage of Section 402's permitting require- ments. *NRDC v. EPA*, 966 F.2d at 1296. Section 402(p) estab- lished a "phased and tiered approach" for NPDES permitting. *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1081-82 (9th Cir. 2011) (citing 33 U.S. § 1342(p)). "The purpose of this approach was to allow EPA and the states to focus their atten- tion on the most serious problems first." *NRDC v. EPA*, 966 F.2d at 1296. "Phase I" included "five categories of storm- water discharges," deemed "the most significant sources of stormwater pollution," who were required to obtain an NPDES permit for their stormwater discharge by 1990. *Brown*, 640 F.3d at 1082 (citing 33 U.S. § 1342(p)(2)). The five categories of the most serious discharge were:

> (p) Municipal and industrial stormwater discharges
> . . .
>
> > (2) . . .
> >
> > . . .
> >
> > (A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.
> >
> > (B) A discharge associated with industrial activity.
> >
> > (C) *A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.*

(D) *A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.*

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

33 U.S.C. § 1342(p)(2) (emphases added). Of the five categories of Phase I dischargers required to obtain the first permits, two are ms4 operators: municipalities with populations over 250,000, and municipalities with populations between 100,000 and 250,000. *Id.* § 1342(p)(2)(C)-(D). Indeed, as noted *supra*, the Permit at issue here was first authorized in 1990 pursuant to the 1987 amendments.

Rather than regulate individual sources of runoff, such as churches, schools and residential property (which one Congressman described as a potential "nightmare"),[6] and as regulations prior to 1987 theoretically required, Congress put the NPDES permitting requirement at the municipal level to ease the burden of administering the program. *Brown*, 640 F.3d at 1085-86. That assumption of municipal control is found in the Permit at issue here—Part 3.G.2 of the Permit states that "Permittees shall possess adequate legal authority to . . . [r]equire persons within their jurisdiction to comply with conditions in Permittee's ordinances, permits, contracts, model programs, or orders (i.e. hold dischargers to its MS4 accountable for their contributions of pollutants and flows.)[.]"

---

[6]*See* 131 Cong. Rec. 15616, 15657 (Jun. 13, 1985) (Statement of Sen. Wallop) ("[The regulations] can be interpreted to require everyone who has a device to divert, gather, or collect stormwater runoff and snowmelt to get a permit from EPA as a point source. . . . Requiring a permit for these kinds of stormwater runoff conveyance systems would be an administrative nightmare.").

**[3]** Defendants' position that they are subject to a less rigorous or unenforceable regulatory scheme for their stormwater discharges cannot be reconciled with the significant legislative history showing Congress's intent to bring ms4 operators under the NPDES-permitting system. Even the selectively excerpted regulatory language Defendants present to us—"Congress was aware of the difficulties in regulating discharges from municipal separate storm sewers . . . [and] intended for EPA and NPDES States to develop permit requirements that were much broader in nature than requirements which are traditionally found in NPDES permits"— does not support Defendants' view. Indeed, this excerpt is but one paragraph from a longer section titled, "Site-Specific Storm Water Quality Management Programs for Municipal Systems." 55 Fed. Reg. 48,037-38. The quoted language follows a paragraph which reads:

> Section 402(p)(3)(iii) of the CWA *mandates* that permits for discharges from municipal separate storm sewers *shall require controls to reduce the discharge of pollutants* to the maximum extent practicable (MEP), including management practices, control techniques and systems, design and engineering methods, and such other provisions as the Director determines appropriate for the control of such pollutants.

55 Fed. Reg. 48,038 (emphasis added). The use of such language—employing "mandates" and commands to regulate —hardly supports Defendants' notion that NPDES permits are unenforceable against municipalities for their stormwater discharges. Moreover, the paragraphs that follow the excerpt explain why developing system-wide controls to manage municipal stormwater is preferable to controlling pollution through end-of-pipe effluent technologies. *Id.* The regulations highlight that "Congress recognized that permit requirements for municipal separate storm sewer systems should be developed in a flexible manner to allow site-specific permit condi-

tions to reflect the wide range of impacts that can be associated with these discharges." *Id.* Rather than evincing any intent to treat permitting "differently" for municipalities, the EPA merely explains why state authorities that issue permits should draft site-specific rules, as the Regional Board did here, and why water-quality standards may be preferable over more-difficult-to-enforce effluent limitations. Avoiding wooden permitting requirements and granting states flexibility in setting forth requirements is not equivalent to immunizing municipalities for stormwater discharges that violate the provisions of a permit.

## B.  Enforcement of Mass-Emissions Violations

Part and parcel with Defendants' argument that they are subject to a relaxed regulatory structure is their view that the Permit's language indicates that mass-emissions monitoring is not intended to be enforcement mechanism against municipal dischargers. Defendants claim that measuring water-quality serves only an hortatory purpose—as Defendants state, "the mass emission monitoring program . . . neither measures nor was designed to measure any individual permittee's compliance with the Permit." This proposition, which if accepted would emasculate the Permit, is unsupported by either our case law or the plain language of the Permit conditions.

**[4]**  "The plain language of CWA § 505 authorizes citizens to enforce *all* permit conditions." *Nw. Envtl. Advocates*, 56 F.3d at 986 (emphasis in original). We used these words and emphasized *all* permit conditions because the language of the Clean Water Act is clear in its intent to guard against all sources and superintendents of water pollution and "clearly contemplates citizen suits to enforce 'a permit or condition thereof.' " *Id.* (citing 33 U.S.C. § 1365(f)(2), (f)(6)); *see also W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 167 (4th Cir. 2010) ("In other words, the statute takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur.").

We have previously addressed, and rejected, municipal attempts to avoid NPDES permit enforcement. In *Northwest Environmental Advocates*, we considered a citizen-suit challenging the City of Portland's operation of a combined sewer system which periodically overflowed and discharged raw sewage into two rivers. 56 F.3d at 981-82. The plaintiffs brought suit on the basis of an NPDES permit condition which "prohibit[ed] any discharges that would violate Oregon water quality standards." *Id.* at 985. Reviewing the history of the 1972 amendments and the Supreme Court's decision in *PUD No.1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700 (1994), we recognized that Congress had authorized enforcement of state water-quality standards, lest municipalities be immunized on the technicality that not all water standards can be expressed as effluent limitations. *Id.* at 988-89. The overflows from the Portland sewer system were "caused primarily by uncontrollable events—*i.e.*, the amount of stormwater entering the system[.]" *Id.* at 989. Because the total amount of water entering and leaving the sewer system was unknown, it was impossible to articulate effluent standards which would "ensure that the gross amount of pollution discharged [would] not violate water quality standards." *Id.* Only by enforcing the water-quality standards themselves as the limits could the purpose of the CWA and the NPDES system be effectuated. *Id.* at 988-90. Indeed, we noted that prior to the 1972 incorporation of effluent limitations, the Clean Water Act depended entirely on enforcement based on water-quality standards. *Id.* at 986. However, troubled by the " 'almost total lack of enforcement' " under the old system, Congress added the effluent limitation standards "not to supplant the old system" but to "improve enforcement." *Id.* at 986 (quoting S. Rep. No. 414, 92d Cong., 2d Sess. 2 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3671).

Our prior case law emphasizes that NPDES permit enforcement is not scattershot—each permit term is simply enforced as written. *See Union Oil*, 813 F.2d at 1491 ("It is unclear whether the court intended to excuse these violations under

the upset defense or under a de minimis theory. In either event, the district court erred. The Clean Water Act and the regulations promulgated under it make no provision for 'rare' violations."); *see also United States v. CPS Chem. Co.*, 779 F. Supp. 437, 442 (D. Ark. 1991) ("For enforcement purposes, a permittee's [Discharge Monitoring Reports] constitute admissions regarding the levels of effluents that the permittee has discharged."). As we explained in *Union Oil*, Congress structured the CWA to function by self-monitoring and self-reporting of violations to " 'avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement.' " 813 F.2d at 1492 (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 64, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3730). When self-reported exceedances of an NPDES permit occur, the Clean Water Act allows citizens to bring suit to enforce the terms of the Permit.

[5] The plain language of the Permit countenances enforcement of the water-quality standards when exceedances are detected by the various compliance mechanisms, including mass-emissions monitoring. First, the Permit incorporates and adopts the Basin Plan, which sets the water-quality standards for bacteria and contaminants for the receiving waters of Southern California, including the Watershed Rivers. The Permit then sets out a multi-part monitoring program for those standards, the goals of which explicitly include "[a]ssessing compliance with this Order[.]" "Compliance" under the Clean Water Act primarily means adhering to the terms and conditions of an NPDES permit. *EPA v. Calif.*, 426 U.S. at 223 ("Thus, the principal means of enforcing the pollution control and abatement provisions of the Amendments is to enforce compliance with a permit."). The first monitoring program listed in the Permit is "Mass Emissions." While Defendants are correct to note that mass-emissions monitoring has as one of its goals "estimat[ing] the mass emissions from the MS4," Defendants fail to mention that another goal, listed just below "estimating," is "[d]etermin[ing] if the MS4 is contributing to exceedances of Water Quality Standards."

Although Defendants argue that compliance with other Permit provisions, in particular Part 2.3's iterative process, forgives violations of the discharge prohibitions in Parts 2.1 and 2.2, no such "safe harbor" is present in this Permit.[7] Rather, Part 2.3 first provides that Permittees shall comply with the Water Quality Standards "through timely implementation of control measures and other actions. . . in accordance with the SQMP and its components." Part 2.3 clarifies that Parts 2 and 3 of the Permit interact, but it offers no textual support for the proposition that compliance with certain provisions shall forgive non-compliance with the discharge prohibitions. As opposed to absolving noncompliance or exclusively adopting the MEP standard, the iterative process ensures that if water quality exceedances "persist," despite prior abatement efforts, a process will commence whereby a responsible Permittee amends its SQMP. Given that Part 3 of the Permit states that SQMP implementation is the "minimum" required of each Permittee, the discharge prohibitions serve as additional requirements that operate as enforceable water-quality-based performance standards required by the Regional Board. *See e.g., Bldg. Indus. Ass'n of San Diego Cnty. v. State Water Res. Control Bd.*, 22 Cal. Rptr. 3d 128, 141 (Cal. Ct. App. 2004) (rejecting arguments that "under federal law the 'maximum extent practicable' standard is the 'exclusive' measure that may be applied to municipal storm sewer discharges and [that] a regulatory agency may not require a Municipality to comply with a state water quality standard if the required controls exceed a 'maximum extent practicable' standard").

---

[7]We also note, as did the district court, that when the validity of this Permit was challenged in California state court by various municipal entities, including the District, the argument that the Permit's discharge prohibitions were invalid for not containing a "safe harbor" was rejected. *See In re L.A. Cnty. Mun. Storm Water Permit Litig.,* No. BS 080548, at 4-5, 7 (L.A. Super. Ct. Mar. 24, 2005) ("In sum, the Regional Board acted within its authority when it included Parts 2.1 and 2.2. in the Permit without a 'safe harbor,' whether or not compliance therewith requires efforts that exceed the 'MEP' standard.").

Part 6.D of the Permit, titled "Duty to Comply," lays any doubts about municipal compliance to rest: "Each Permittee must comply with all terms, requirements, and conditions of this Order. Any violation of this order constitutes a violation of the Clean Water Act . . . and is grounds for enforcement action, Order termination, Order revocation and reissuance, denial of an application for reissuance; or a combination thereof[.]" This unequivocal language is unsurprising given that all NPDES permits must include monitoring provisions ensuring that permit conditions are satisfied. *See* 33 U.S.C. § 1318(a)(A) ("[T]he Administrator [of the EPA] shall require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods (including where appropriate, biological monitoring methods), [and] (iv) sample such effluents (in accordance with such methods, at such locations, at such intervals, and in such manner as the Administrator shall prescribe)[.]"); 40 C.F.R. § 122.44(i)(1) (specifying the monitoring requirements for compliance, "mass . . . for each pollutant limited in the permit," and volume of effluent discharged); *Ackels v. EPA*, 7 F.3d 862, 866 (9th Cir. 1993) ("[T]he Act grants EPA broad authority to require NPDES permitees to monitor, at such intervals as the Administrator shall prescribe, whenever it is required to carry out the objectives of the Act.").

**[6]** In sum, the Permit's provisions plainly specify that the mass-emissions monitoring is intended to measure compliance and that "[a]ny violation of this Order" is a Clean Water Act violation. The Permit is available for public inspection to aid this purpose. Accordingly, we agree with the district court's determination that an exceedance detected through mass-emissions monitoring is a Permit violation that gives rise to liability for contributing dischargers.

## II.  Evidence of Discharge

We next turn to the factual issue on which the district court granted summary judgement in favor of Defendants—whether

any evidence in the record shows Defendants discharged stormwater that caused or contributed to water-quality violations. The district court determined that a factual basis was lacking:

> Plaintiffs failed to present evidence that the standards-exceeding pollutants passed through the Defendants' MS4 *outflows* at or near the time the exceedances were observed. Nor did Plaintiffs provide any evidence that the mass emissions stations themselves are located at or near a Defendant's outflow. Plaintiffs do represent in their supplemental briefing that their monitoring data reflects sampling conducted at or near Defendants' outflows. . . . However, the declarations on which Plaintiffs rely do *not* clearly indicate that the sampling in question was conducted at an outflow (as opposed to in-stream).

> . . .

> In short, Plaintiffs have failed to follow the Court's instructions and present data which could establish that "standards-exceeding pollutants . . . passed through Defendants' MS4 *outflows* at or near the time the exceedances were observed." That the pollutants must have passed through an outflow is key because, as the Court found in the March 2 Order, standards-exceeding pollutants must have passed through a County or District outflow in order to constitute a discharge under the Clean Water Act and the Permit.

**[7]** Plaintiffs have argued throughout this litigation that the measured exceedances in the Watershed Rivers *ipso facto* establish Permit violations by Defendants. Because these points are designated in the Permit for purposes of assessing "compliance," this argument is facially appealing. But the Clean Water Act does not prohibit "undisputed" exceedances;

it prohibits "discharges" that are *not* in compliance with the Act, which means in compliance with the NPDES. *See* 33 U.S.C. § 1311(a); *see also Miccosukee Tribe*, 541 U.S. at 102. While it may be undisputed that exceedances have been detected, responsibility for those exceedances requires proof that some entity discharged a pollutant. Indeed, the Permit specifically states that "*discharges* from the MS4 that cause or contribute to the violation of the Water Quality Standards or water quality objectives *are prohibited*."

"[D]ischarge of pollutant" is defined as "any addition of any pollutant to navigable waters from any point source[.]" 33 U.S.C. § 1362(12). Under the Clean Water Act, the MS4 is a "Point Source." *See* 33 U.S.C. § 1342(p)(2), 1362(14). "Navigable waters" is used interchangeably with "waters of the United States." *See Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir. 2001). Those terms mean, *inter alia*, "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide[.]" 40 C.F.R. § 122.2. The Watershed Rivers are all navigable waters.

Thus, the primary factual dispute between the parties is whether the evidence shows any *addition* of pollutants by Defendants to the Watershed Rivers. Defendants contend that the "District does not generate any of the pollutants in the system, but only transports them from other permitted and non-permitted sources." Moreover, Defendants contend that by measuring mass-emissions downstream from where the pollutants entered the sewer system, it is not possible to pinpoint which entity, if any, is responsible for adding them to the rivers. In the words of the district court, there is no evidence that "standards-exceeding pollutants . . . passed through Defendants' MS4 *outflows* at or near the time the exceedances were observed." Plaintiffs counter that the Monitoring Stations are downstream from hundreds of miles of storm drains which have generated the pollutants being detected. To Plaintiffs, it

is irrelevant which of the thousands of storm drains were the source of polluted stormwater—as holders of the Permit, Defendants bear responsibility for the detected exceedances.

Resolving this dispute over whether Defendants added pollutants depends heavily on the level of generality at which the facts are viewed. At the broadest level, all sides agree with basic hydrology—upland water becomes polluted as it runs over urbanized land and begins a downhill flow, first through municipal storm drains, then into the MS4 which carries the water (and everything in it) to the Watershed Rivers, which flow into the Pacific Ocean. More narrowly, it is, as Plaintiffs concede, impossible to identify the particular storm drains that had, for instance, some fecal bacteria which contributed to a water-quality violation. Ultimately, each side fails to rebut the other's arguments. Defendants ignore their role as controllers of thousands of miles of MS4 and the stormwater it conveys[8] by demanding that Plaintiffs engage in the Sisyphean task of testing particular storm drains in the County for the source of each pollutant. Likewise, Plaintiffs did not enlighten the district court with sufficient evidence for certain claims and assumed it was obvious to anyone how stormwater makes its way from a parking lot in Pasadena into the MS4, through a mass-emissions station, and then to a Watershed River.

[8] Despite shortcomings in each side's arguments, there is evidence in the record showing that polluted stormwater from the MS4 was added to two of the Watershed Rivers: the Los

---

[8]Defendants' untenable position about their responsibility for discharges is confirmed by the testimony of their Rule 30(b)(6) witness:

*Question*: What if those flows [which exceeded water-quality standards] were so polluted with oil and grease that they were on fire as they came out of the system? Would your view be the same, that the District is not contributing to exceedances?

*Answer*: That the system the District maintains is not contributing to, yes.

Angeles River and San Gabriel River. Because the mass-emissions stations, as the appropriate locations to measure compliance, for these two rivers are located in a section of the MS4 owned and operated by the District, when pollutants were detected, they had not yet exited the point source into navigable waters. As such, there is no question over who controlled the polluted stormwater at the time it was measured or who caused or contributed to the exceedances when that water was again discharged to the rivers—in both cases, the District. As a matter of law and fact, the MS4 is distinct from the two navigable rivers; the MS4 is an intra-state man-made construction—not a naturally occurring Watershed River. *See Headwaters*, 243 F.3d at 533 ("The EPA has interpreted 'waters of the United States' to include 'intrastate lakes, rivers, streams (including intermittent streams) . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce' and 'tributaries of [those] waters.' " (quoting 40 C.F.R. § 122.2(c), (e)). At least some outfalls for the MS4 were downstream from the mass-emissions stations. *See* 40 C.F.R. § 122.26(9) ("Outfall means a point source . . . at the point where a municipal separate storm sewer discharges to waters of the United States . . . ."). The discharge from a point source occurred when the still-polluted stormwater flowed out of the concrete channels where the Monitoring Stations are located, through an outfall, and into the navigable waterways. We agree with Plaintiffs that the precise location of each outfall is ultimately irrelevant because there is no dispute that MS4 eventually adds stormwater to the Los Angeles and San Gabriel Rivers downstream from the Monitoring Stations.

Although the District argues that merely channeling pollutants created by other municipalities or industrial NPDES permittees should not create liability because the District is not an instrument of "addition" or "generation,"[9] the Clean Water

---

[9]This issue does not usually arise in Clean Water Act litigation because it is generally assumed that ms4s "discharge" stormwater. *See, e.g.*, *Miss.*

Act does not distinguish between those who add and those who convey what is added by others—the Act is indifferent to the originator of water pollution. As Judge Wilkinson of the Fourth Circuit cogently framed it: "[The Act] bans 'the discharge of any pollutant by any person' regardless of whether that 'person' was the root cause or merely *the current superintendent of the discharge*." *Huffman*, 625 F.3d at 167 (emphasis added). "Point sources" include instruments that channel water, such as "any pipe, ditch, *channel*, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added). The EPA's regulations further specify that ms4 operators require permits for channeling: "Discharge of a pollutant . . . includes additions of pollutants into waters of the United States from: surface runoff which is collected or *channelled* by man; discharges through pipes, sewers, or other conveyances owned by a State [or] municipality." 40 C.F.R. § 122.2 (emphasis added). "[M]ost urban runoff is discharged through conveyances such as separate storm sewers or other conveyances which are point sources under the CWA. These discharges are subject to the NPDES program." 55 Fed. Reg. 47,991. Finally, the Supreme Court stated in *Miccosukee Tribe* that "the definition of 'discharge of a pollutant' contained in § 1362(12) . . . *includes* within its reach point sources that do not themselves generate pollutants." 541 U.S. at 105 (emphasis added).

**[9]** Accordingly, the district court erred in stating that "Plaintiffs have not provided the Court with the necessary evidence to establish that the Los Angeles River and the San Gabriel River below the mass emissions monitoring stations

---

*River Revival v. Adm'r, E.P.A.*, 107 F. Supp. 2d 1008, 1009 (D. Minn. 2000) ("These lawsuits involve the discharge of storm water into the Mississippi River through the Cities' storm sewers. Thus, and this is not in dispute, the storm water discharge is subject to the NPDES permitting requirements.").

are bodies of water that are distinct from the MS4 above these monitoring stations." In light of the evidence that the Los Angeles River and San Gabriel River mass-emission stations are in concrete portions of the MS4 controlled by the District, it is beyond dispute that the District is discharging pollutants from the MS4 to the Los Angeles River and San Gabriel River in violation of the Permit. Thus, Plaintiffs are entitled to summary judgment on Claims 2 and 3.

**[10]** However, we agree with the district court that, as the record is currently constituted, it is not possible to mete out responsibility for exceedances detected in the Santa Clara River and Malibu Creek (Claims 1 and 4). Like the district court, we are unable to identify the relationship between the MS4 and these mass-emissions stations. From the record, it appears that both monitoring stations are located within the rivers themselves. Plaintiffs have not endeavored to provide the Court with a map or cogent explanation of the inter-workings or connections of this complicated drainage system. We recognize that both the Santa Clara and Malibu Creek Monitoring Stations are downstream from hundreds or thousands of storm drains and MS4 channels. It is highly likely, but on this record nothing more than assumption, that polluted stormwater exits the MS4 controlled by the District and the County, and flows downstream in these rivers past the mass-emissions stations. To establish a violation, Plaintiffs were obligated to spell out this process for the district court's consideration and to spotlight how the flow of water from an ms4 "contributed" to a water-quality exceedance detected at the Monitoring Stations. *See, e.g.*, *Nicholas Acoustics & Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("We wish to emphasize most strongly that it is fool-hardy for counsel to rely on a court to find disputed issues of material fact not highlighted by counsel's paperwork; a party that has suffered the consequences of summary judgment below has a definite and specific duty to point out the thwarting facts . . . . Judges are not ferrets!"). Contrary to Plaintiffs' contention, this would not require independent sampling of

the District's outfalls. Indeed, simply ruling out the other contributors of stormwater to these two rivers or following up to vague answers given by Defendants' witnesses could have satisfied Plaintiffs' evidentiary obligation. In the alternative, prior to commencing actions such as this one, Plaintiffs could heed the district court's sensible observation and, for purposes of their evidentiary burden, "sample from *at least one* outflow that included a standards-exceeding pollutant[.]"

Finally, for all four Watershed Rivers, the record is silent regarding the path stormwater takes from the unincorporated land controlled by the County to the Monitoring Stations. The district court correctly demanded evidence for the County's liability, which Plaintiffs did not proffer.

[11] In sum, Plaintiffs were entitled to summary judgment on Claims 2 and 3 against the District for the Los Angeles River and San Gabriel River because (1) the Monitoring Stations for these two rivers are located in a portion of the MS4 owned and operated by the District, (2) these Monitoring Stations detected pollutants in excess of the amount authorized by the NPDES permit, and (3) this polluted water "discharged" into the Los Angeles River and San Gabriel River. The Plaintiffs, however, have not met their burden on summary judgment for their other claims because they did not provide the district court with evidence that the MS4 controlled by the District "discharged" pollutants that passed through the Monitoring Stations in the Santa Clara River and Malibu Creek, or that ms4s controlled by the County "discharged" pollutants that passed through the Monitoring Stations in any of the four rivers in question.

## CONCLUSION

The district court's judgment for Defendant District on Claims 2 and 3 of the First Amended Complaint is REVERSED, and this matter is REMANDED to the district court for further proceedings consistent with this opinion. The

district court's grant of summary judgment for Defendant District on Claims 1 and 4 and for Defendant County on all Watershed Claims is AFFIRMED.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED**.

Each side shall bear its own costs.